

Sheila D Seeney
1121 Nobb Hill Dr
W st Chester, PA  19380-1884

UNITED STATED DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

Sheila Seeney
**Plaintiff**
**v.**
Elwyn Inc.
**Defendant**

## COMPLAINT

1.) Fill in our address (street, city or town, state, and zip code):

Sheila Seeney

1121 Nobb Hill Drive

West Chester, PA 19380 -1884

2.) Defendant's address is (street, city or town, state and zip code):

Elwyn Inc.

111 Elwyn Road

Elwyn, PA 19063

3.) **Statement of Claim:**
Fill in the facts of your case, and state why you are filing t iis lawsuit.
Give names, dates, and places as best you can.

I was hired on December 15, 1980, as a counselor at Elw n Inc. to work with mentally and physically challenged clients of all age s with behavioral problems.  The date of 2/22/06, is when I was r taliated against and harassed because of my race, black, gender, female, an l age, 59. and forced to resign due to the retaliation, harassment in viola tion of Title VII of the Civil Rights Act of 1964, as amended: the Age Discri mination Employment Act and the Equal Pay Act (EPA).  Such retali ition occurred in an Elwyn building, Cottage I, during October 18, 2005, an l until February 22 , 2006, under the direction of Supervisor Luca i Kamara and Unit Director, Maryanne Booth.  Contact with Human Res urces, Pete Vitarelle and William Ward  and the Union, resulted in n offers of support from either. Regulations or the Federal Law affec ting workers pay (EISA(29USClas 201), were not followed by Maryann Booth.  Ms.

Booth manipulated the end of the work week to avoid paying Sheila Seeney for time she had already worked. Ms. Booth also failed to pay her commuting time when calling her into work for a meeting with her. Ms. Seeney also received a contract. (Section 1983 of the Civil Rights Act of 1871 unwarranted letter from Ms. Booth, which set in motion, her forced early retirement The supervisor, Kamara, retaliated against Ms. Seeney for reporting his unprofessional conduct and whistle blowing about his sleeping while on duty. He also received no disciplinary actions for threatening overtures towards Sheila Seeney, only to remain as her supervisor. Dehumanizing acts and defamation of character were committed by these supervisors. Conjuring up false and invalid labor reasons intentionally to humiliate Sheila Seeney by calling Elwyn Security and having her shamefully and embarrassingly removed or discharged off of Elwyn's premises (an Elwyn policy) and extreme in my case (to make an example of this employee)(for the way she cleaned the refrigerator) (Civil Rights Act of 1991)during any hour of the night. It had with these supervisors, become a policy based on retaliation with intentional infliction, also with a strong arm of disciplinary tool, when it came to abusing Sheila Seeney. She was helpless and defenseless. Discharging her off premises, but she felt discarding, a great total amount of (3) separate times, all during her worked hours on 3rd shift. These (3) times, all happened simply for my questioning, questionable procedures. Many procedures just applied, by supervisors were completely new, and her workload became increased nightly when she questioned their procedures. Importantly, none with legal standing in labor laws. In the year 2005, it is still a fact - that because of my skin color, it really has not mattered at Elwyn - how this (59) year old black woman with (25) years of dedicated service was mistreated.   Elwyn was beyond negligent regarding how Sheila Seeney was left to work through the night in a most vulnerable position,due to a lack of assigned nighttime staff, especially due to a lack of upper management staff to intercept these incidents.

4) Fill in what you are requesting in this case:

Elwyn Inc. should be held accountable for Discrimination EPA,
compensatory damages for emotional distress and economic loss, both past
and future; also for wages employment benefits or other compensation
denied or loss by such violation including front wages, reasonable
attorney fees, the employee expert witness fee, if any, all back and future
benefits she would have been entitled to, damages for pain suffering and
humiliation and other costs of the action.

5.) If you filed charges with the Equal Employment Opportunity Commission
or with the Pennsylvania Human Relations Commission, please attach a
copy of the Notice-of-Rights-to-Sue letter.

6.) If there is a right to at jury trial in your type of case, so you want one?
Yes __X__   No _____

_____
(Your Signature)

I declare under penalty of perjury that the information filled in is true and correct.

October 18, 2008
(Date)

_____
(Your Signature)

**ER**

Sheila D Seeney
1111 Nobb Hill Dr
West Chester, PA 19380-1884

### UNITED STATED DISTRICT COURT FOR THE
### EASTERN DISTRICT OF PENNSYLVANIA

08 CV 532

Sheila Seeney
**Plaintiff**

v.

Elwyn Inc.
**Defendant**

### REQUEST FOR APPOINTMENT OF ATTORNEY

I, Sheila Seeney, Petitioner/Plaintiff, request appointment of counsel as
provided by 42 U/S/C/ s2000(e)5.

1.) I have made a diligent effort to employ an attorney (check appropriate box(es)):

CONTACTED PRIVATE ATTORNEY(S)
(List all attorney(s) contacted and state why each is not representing you.)
Arthur Girton - remained undecided even though I called frequently.
Rubin, Fortunato & Harbison P.C. - determined that they would be unable
to represent me.

CONTACTED A LEGAL AID ORGANIZATION
(State when this organization was contacted and why it did not assis you.)
Legal Aid is searching for the appropriate attorney

Lawyers seem leery about taking a case against a Grand Old established organization, such as Elwyn.

CONTACTED BAR ASSOCIATION LAWYER REFERRAL SERVICE.
If available (State what assistance was provided.)
Chester County Bar Association

stated they would call me back, but never did receive their call back.


2.) If unable to pa attorney's fees or costs - I am financially unable to hire counsel
(Complete and file Form 2 - In Forma Pauperis Petition)

3.) I believe I have a claim against the following employer (Give name and address):

Elwyn Inc.

111 Elwyn Road

Elwyn, PA 19063


4). The reason(s) for my claim are (Give brief employment history with dates and specific
reasons for lawsuit):

I began working for Elwyn Inc. December 15, 1980. On february 22, 200 as
concluded by and with my agreement the Pennsylvania Unemployment
compensation Board of Review (October 26, 2006) that I was forced into  m
unwanted early retirement and "had cause of a necessitous and compelling
nature for quitting this employment after 25 years of service." I know t iat
I was retaliated against and harassed because of my race, black, gender
female, and age, 59, and was forced to resign due to the continued retal ation,
harassment in violation of Title VII of the Civil Rights Act of 1964 as
amended, the Age Discrimination in Employment Act, and the Equal P y Act
(EPA).


I certify under the penalty of perjury that the foregoing statements are true and correct.

_Signature_

_October 18, 2008_
**Date**



## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHEILA SEENEY, | : | |
| | : | **CIVIL ACTION NO.** |
| **Plaintiff** | : | **08-5032    (ECR)** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| ELWYN, INC. | : | |
| | : | |
| **Defendant** | : | |

### PLAINTIFF'S AMENDED COMPLAINT

Plaintiff, Sheila Seeney, by and though her undersigned counsel, The Chartwell Law Offices, LLP, hereby complains of defendant, Elwyn, Inc., as follows:

### THE PARTIES

1.    Plaintiff, Sheila Seeney, is an adult individual residing at 1121 Nobb Hill Drive, West Chester, Pennsylvania 19380.

2.    Defendant, Elwyn, formerly known as Elwyn, Inc., is a business organized and existing pursuant to the laws of the Commonwealth of Pennsylvania, with a principle place of business located at 1111 Elwyn Road, Elwyn, Pennsylvania 19063.

### JURISDICTION

3.    This Court may exercise jurisdiction over this matter pursuant to 42 U.S.C. §2000 b, et seq.

### VENUE

4.      Venue is proper in this Court pursuant to 28 U.S.C. §1446 and 29 U.S.C. §2008.

### FACTUAL ALLEGATIONS

5.      On or about December 15, 1980, Plaintiff was hired by defendant to work as a counselor for mentally and physically challenged clients with behavioral problems.

6.      Plaintiff had an exemplary work record until October 18, 2005, at which point she began to experience discrimination and retaliation in violation of 42 U.S.C. §2000 (e).

7.      Specifically, Plaintiff was subjected to discipline in the form of verbal and written discipline imposed by her immediate supervisor, Luceni Kamara ("Kamara"), for which her similarly situated Caucasian co-workers were not, for the same purported conduct, such as leaving her work area untidy.

8.      Plaintiff complained to Unit Director Maryanne Booth ("Booth") of Kamara's discriminatory conduct.

9.      At the same time, Plaintiff also complained of Karama's repeated sleeping while on duty, and of his threatening behavior toward her.

10.     Management at Defendant, including Booth, ignored Plaintiff's Complaints.

11.     Following Plaintiff's Complaints, Kamara harassed and discriminated against her even further, including, but not limited to:

       a.      imposing discipline not imposed on Caucasian employees for identical minor infractions of work rules;

b.      continuing to threaten Plaintiff's job and personal well-being;

c.      retaliating against Plaintiff by singling her out for punishment not

visited upon any other employees;

d.      terminating her employment.

12.     Following her termination, Plaintiff filed a Notice of Charge of

Discrimination with the Equal Employment Opportunity Commission ("EEOC"). On or

about July 24, 2008, the EEOC issued Plaintiff a Notice of Rights letter, fulfilling the

administrative exhaustion requirement before filing suit in this Court. A true and

complete copy of the EEOC's Notice of Rights letter is attached hereto and made a part

hereof and marked as Exhibit "A."

13.     Plaintiff's Complaint was filed on October 20, 2008, within the time

prescribed by 42 U.S.C. § 2000e, et seq.

**COUNT I**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, as amended,**
**DISPARATE TREATMENT**

14.     Plaintiff hereby repeats and reasserts the allegations contained in

Paragraphs 1 through 13 as though set forth at length herein.

15.     The actions of Defendant, by and through its employee, Kamara,

constitute violations of Title VII of the Civil Rights Act of 1964, as amended.

WHEREFORE, Plaintiff, Sheila Seeney, prays for and demands judgment in her

favor and against Defendant, for an award of front pay, back pay, compensatory and

punitive damages, interest, attorneys fees, costs of suit, and any other and further relief

this Court deems equitable and just.

## COUNT II
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, as amended, RETALIATION

16.     Plaintiff hereby incorporates and reasserts the allegations contained in

Paragraphs 1 through 15 as though set forth at length herein.

17.     Plaintiff engaged in protected activity, i.e., complaining to Booth of

Defendant's discriminatory conduct.

18.     As a direct and proximate result of Plaintiff's complaint to Booth, Plaintiff

was subjected to further harassment, discrimination, and ultimately, termination.

WHEREFORE, Plaintiff, Sheila Seeney, prays for and demands judgment in her

favor and against Defendant, for compensatory and punitive damages, interest, attorneys

fees, costs of suit, and any other and further relief this Court deems equitable and just.


Dated: 17 Aug 2009                    THE CHARTWELL LAW OFFICES, LLP


                                       By: __/s/ Michael J. Needleman_
                                           Michael J. Needleman

# EXHIBIT "A"

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: Sheila Seeney
　　1121 Nobb Hill Drive
　　West Chester, PA 19380

From: Equal Employment Opportunity Commission
　　　 Philadelphia District Office
　　　 801 Market Street, Suite 1300
　　　 Philadelphia, PA  19107-3127

*On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 53C-2007-00860 | Legal Unit | (215) 440-2828 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[   ]　The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[   ]　Your allegations did not involve a disability that is covered by the Americans with Disabilities Act.

[   ]　The Respondent employs less than the required number of employees or is not otherwise covered by the statues.

[   ]　Your charge was not timely filed with EEOC.  In other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[ X ]　The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[   ]　The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[   ]　Other *(briefly state)* _____

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you.  You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit must be filed <u>WITHIN 90 DAYS</u> from your receipt of this Notice; otherwise, your right to sue based on this charge will be lost.  (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission


_____William D. Cork_____　　　　　　7/24/08
*for* Marie M. Tomasso, District Director　　　　*(Date Mailed)*

Enclosure(s)
　　Information Sheet

cc:　Elwyn, Inc.
　　　William J. Ward, Vice President Human Resource (For Respondent)

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| SHEILA SEENEY, | : | |
| | : | **CIVIL ACTION NO.** |
| Plaintiff | : | **08-5032      (ECR)** |
| | : | |
| | : | |
| v. | : | |
| | : | |
| ELWYN, INC. | : | |
| | : | |
| Defendant | : | |

### CERTIFICATE OF SERVICE

I, the undersigned counsel for Plaintiff, hereby certify that on the date listed below, I caused to have a true copy of the foregoing entry of appearance served on counsel for Defendant, via electronic and regular U.S. Mail, postage prepaid, as follows:

John P. Gonzales, Esquire
Marshall Dennehey Warner Coleman & Goggin
620 Freedom Business Center, suite 300
King of Prussia, PA 19406

Dated: 19 August 2009

THE CHARTWELL LAW OFFICES, LLP

By: _____
Michael J. Needleman



1

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF PENNSYLVANIA

CIVIL ACTION NO. 08-05032

| | | |
|---|---|---|
| SHEILA SEENEY, | ) | DEPOSITION UPON |
| | ) | |
| Plaintiff, | ) | ORAL EXAMINATION |
| | ) | |
| -vs- | ) | OF |
| | ) | |
| | ) | SHEILA SEENEY |
| | ) | |
| ELWYN, INC., | ) | |
| | ) | |
| Defendant. | ) | |

- - - - - - - - - - - - - - - - -

TRANSCRIPT OF DEPOSITION,
taken by and before VITA M. MULHOLLAND, Certified
Court Reporter and Notary Public, at the THE
CHARTWELL, 1717 Arch Street, 46th Floor,
Philadelphia, Pennsylvania, on Tuesday, December
15, 2009, commencing at 10:15 a.m.

ERSA COURT REPORTERS
30 South 17th Street
United Plaza - Suite 1520
Philadelphia, PA 19103
(215) 564-1233

SHEILA SEENEY

**2**

1 APPEARANCES:
2
 THE CHARTWELL
3 BY:  MICHAEL J. NEEDLEMAN, ESQUIRE
  1717 Arch Street, 46th Floor
4 Philadelphia, Pennsylvania 19103
  Attorney for Plaintiff
5
6
  MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
7 BY:  JOHN P. GONZALES, ESQUIRE
  620 Freedom Business Center, Suite 300
8 Philadelphia, Pennsylvania 19406
  Attorney for Defendant
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**3**

1            I N D E X
2
3
4 WITNESS
5 Sheila Seeney
6
7
8 EXAMINATION                    PAGE
9 By Mr. Gonzales            4
10 By Mr. Needleman          146
11
12
13        E X H I B I T S
14
15              PAGE    PAGE
   NUMBER    DESCRIPTION    MARKED  ATTACHED
16
17 Seeney-1 Typewritten Complaint  85   152
18 Seeney-2 Typewritten Complaint  91   153
19 Seeney-3 Typewritten Complaint  118  154
20 Seeney-4 Typewritten Complaint  128  155
21 Seeney-5 Typewritten Complaint  130  156
22 Seeney-6 Resignation Letter  132  157
23
24

**4**

1        (By agreement of counsel, the
2 reading, signing, sealing, filing and
3 certification of the transcript have been
4 waived; and all objections, except as to
5 the form of the question, have been
6 reserved until the time of trial.)
7
8        SHEILA SEENEY, having been duly
9 sworn, was examined and testified as
10 follows:
11
12        E X A M I N A T I O N
13
14 BY MR. GONZALES:
15 Q.    Miss Seeney, my name is John Gonzales.  I
16 represent Elwyn in a lawsuit that you have filed
17 against them and we are here today to take your
18 deposition which is my opportunity to ask you
19 questions under oath regarding any information
20 that might be relevant to your lawsuit; before I
21 start asking you questions, however, there are a
22 couple of instructions that I want to provide to
23 you.
24        Instruction number one is to give a

**5**

1 verbal response to my questions.  You will note
2 there is a court reporter, she is seated to your
3 right, she is taking down all of the questions
4 that I'm going to ask and all of the answers that
5 you provide; however, it's very difficult for her
6 to take down nods of the head or unt-unt or
7 uh-huhs, so it's important you give a verbal
8 response to my questions.
9        Do you understand that instruction?
10 A.    Yes.
11 Q.    The second instruction is just to wait
12 until I finish asking a question before you give
13 an answer; again, it makes it easier on the court
14 reporter if only one of us is talking at once.
15 Would you be able to follow that instruction?
16 A.    Yes.
17 Q.    Great.  And the third instruction is if
18 you don't hear or understand a question that I
19 ask, just ask me to rephrase it because if you do
20 answer the question, I will assume that you heard
21 it and that you understood it.  Do you understand
22 that instruction?
23 A.    Yes.
24 Q.    Is there any reason why you would not be

**2  (Pages 2 to 5)**

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

SHEILA SEENEY

6

1 able to testify truthfully today?

2 A.    No, no reason at all.

3 Q.    Great.  Can you state your full name,
4 please?

5 A.    Sheila Diane Seeney.

6 Q.    What's your date of birth?

7 A.    3/7/46.

8 Q.    And where do you live?

9 A.    1121 Nobhill Drive, there is no K in Nob,
10 West Chester, Pennsylvania, West Chester two
11 words, Pennsylvania, 19380-1884.

12 Q.    Do you live there with anyone?

13 A.    My sister.

14 Q.    What's her name?

15 A.    Sharon Seeney.

16 Q.    Do you own the house?

17 A.    Yes, we own the house.

18 Q.    Jointly?

19 A.    Jointly.

20 Q.    How long have you lived there?

21 A.    1980, March of 1980.

22 Q.    Are you currently employed?

23 A.    No, I am not.

24 Q.    When was the last time you worked?

7

1 A.    Elwyn, February 22nd, 2006.

2 Q.    Have you applied for any work since
3 February 2006?

4 A.    Yes, I have.

5 Q.    And where have you applied?

6 A.    It was in my area.

7 Q.    Pardon me?

8 A.    It was in my area, middle school, I can't
9 think of it right now; that's one of the papers I
10 didn't see yesterday.  Sorry, yes, it was
11 intermediate middle school as assistant, working
12 as an assistant to teachers.

13 Q.    Right.  At the middle school in West
14 Chester?

15 A.    The address is West Chester but it's not
16 really West Chester.

17 Q.    Do you know what school district it was?

18 A.    I did but not right now.

19 Q.    Okay.  And when did you apply for that
20 job?

21 A.    Do you, by any chance, remember the
22 papers?

23        MR. NEEDLEMAN:  Unfortunately, I
24 can't help you.  You have to tell Mr.

8

1        Gonzales what you remember.

2 BY MR. GONZALES:

3 Q.    And, Miss Seeney, just so you know, this
4 is not like a memory test -- let me finish.  This
5 is not a memory test in any way; if you don't
6 remember, just tell me you don't remember and we
7 can follow up with either written questions to
8 your attorney or --

9 A.    Oh, would you mind if I looked for it?

10 Q.    Sure, no.  Go ahead.

11 A.    I don't know which paper it is in though,
12 if you have another question.

13 Q.    Take your time; if you can't find it and
14 you want to do it later, we will do it later; if
15 you want to do it now, it's up to you.

16 A.    What was the next question while I am
17 looking?

18 Q.    I am going to be asking you about other
19 jobs you applied for.

20 A.    Oh, no, there is no others.  Well, let me
21 think.  Oh, yes, there was.

22        MR. NEEDLEMAN:  See if you can
23        find this first --

24        THE WITNESS:  Chester County

9

1        Hospital.

2        MR. NEEDLEMAN:  -- and then you
3        can go onto Mr. Gonzales' next question.

4        THE WITNESS:  I don't think I --

5        I might not even have it.  Oh, yes, I do,

6        but I don't have the newspaper article

7        that came with it.  It doesn't mention

8        the newspaper area.  I was just applying

9        for an assistant job with -- work with

10        the school teachers but I don't have the

11        address.  I would have to find the

12        article.

13 BY MR. GONZALES:

14 Q.    Okay.  Does it say, the document that you
15 are looking at, does it say what school or school
16 district that you applied to?

17 A.    It was in the West Chester area
18 intermediate school; if I had known I needed that
19 I could have brought it, the whole thing, it had
20 the telephone number and everything.

21 Q.    That's fine.  As long as there is a
22 document somewhere that I can follow up with your
23 attorney.

24 A.    I can mail it to you if I can find it.

3 (Pages 6 to 9)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

10

1           MR. NEEDLEMAN: If you have it.
2           THE WITNESS: The newspaper
3      article is not here.
4 BY MR. GONZALES:
5 Q.      That's fine. I will follow up with your
6 attorney on that, that's fine. When did you
7 apply if you remember, what year?
8 A.      It was recently. It had to be a year,
9 let me think. My sister went in the hospital in
10 '08 of January, so it was either September of
11 '07 -- I applied in September of '07 and I never
12 heard from them. And then I am quite sure, if my
13 sister were here she could tell me, in January
14 she had to go in the hospital, so, no, that was
15 '07.
16 Q.      Okay. Now, you said you applied for
17 another job at Chester County Hospital, is that
18 correct?
19 A.      Yes, but that was in the beginning stages
20 when I first left Elwyn.
21 Q.      So that would have been some time in
22 2006?
23 A.      Probably 2006, a few months or four
24 months later after I got my -- after, you know.

11

1 Q.      Right. After February of 2006 when you
2 left Elwyn?
3 A.      Chester County Hospital?
4 Q.      Yes.
5 A.      That would be some time that year after I
6 left.
7 Q.      Okay. And what job did you apply for
8 there?
9 A.      Oh, I was open for anything that they had
10 at that time.
11 Q.      And did you get an interview?
12 A.      No, but they did send me a card but they
13 didn't say -- they weren't hiring or something at
14 that time, I am not quite sure; hopefully, I can
15 find the card.
16 Q.      But they did not hire you, is that
17 correct?
18 A.      No, I never had an interview.
19 Q.      Did you apply anywhere else for a job?
20 A.      No.
21 Q.      Can you tell me about your educational
22 background?
23 A.      Oh, it's not much; I went to Henderson
24 High School, I graduated. Oh, cosmetology I

12

1 graduated.
2 Q.      What year?
3 A.      '66.
4 Q.      And any follow-up schooling after high
5 school?
6 A.      Other than hairdressing, no.
7 Q.      Now, it's my understanding that you
8 started working at Elwyn in 1980, is that your
9 recollection?
10 A.      I know it was December 15th, today right
11 here is the exact date, yes, 1980.
12 Q.      Okay. Had you worked with the
13 developmentally disabled before you started
14 working at Elwyn?
15 A.      No. Worked at Children's Cottage, it was
16 called Children's Cottage, which was with the
17 county at the time for eight years and they
18 decided to close our facility.
19 Q.      How did you find out about the job at
20 Elwyn?
21 A.      Well, working -- Children's Cottage is
22 very close to Elwyn.
23 Q.      When you started working for Elwyn in
24 1980, what was your job?

13

1 A.      Working on third shift as a residential
2 counselor.
3 Q.      Did you have any other jobs at Elwyn up
4 until the time you left in 2006?
5 A.      While I was at Elwyn?
6 Q.      Yes.
7 A.      No, I always worked just at Elwyn because
8 I had my daughter to raise.
9 Q.      And I think the title was residential
10 life counselor?
11 A.      Yes; sometimes it changes, yeah.
12 Q.      But, generally, even if the title may
13 have changed, did your general responsibilities
14 change?
15 A.      Oh, well, they grew, yeah.
16 Q.      We will talk about that. I understand
17 that but, generally, in other words, did you, at
18 some point, did you become a supervisor or at
19 some point, did you --
20 A.      Never supervisor, no.
21 Q.      Did you always work on the third shift?
22 A.      Always, both jobs.
23 Q.      And what hours was the third shift?
24 A.      At Elwyn the hours were, I think I put it

4 (Pages 10 to 13)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

SHEILA SEENEY

14

1 down one time wrong, ten to six.
2 Q.     10:00 p.m. to 6:00 a.m.?
3 A.     Yes, when I worked for the county it was
4 11 to 7.
5 Q.     Did you work in a specific cottage or
6 building at Elwyn?
7 A.     I worked -- for five years I floated so I
8 was in every building there was on the grounds
9 and then after five years I worked in one
10 building, and then I'd moved to another building.
11 Q.     Okay.  What were the buildings that you
12 worked at after you were a floater when you were
13 actually assigned to a building, what were the
14 different buildings you worked at?
15 A.     I can't remember the names; I worked
16 there quite a few years and I think the last two
17 buildings I can remember is Cottage 3 and then
18 Cottage the older building I can't remember
19 the name of, there were quite a few clients in
20 that building, like 30 something clients in
21 there, so then they built the newer buildings
22 which was the cottages which had 16 clients.
23 Q.     The building that you were working in at
24 the time that you left, what building was that?

15

1 A.     Cottage 1.
2 Q.     When did you begin working in Cottage 1?
3 A.     After I left Cottage 3.
4 Q.     Do you remember what year that was?
5 A.     Oh, yeah, shortly after 1999; some time
6 after 1999; it might have been six months later.
7 Q.     During the entire time that you worked in
8 Cottage 1 did you work on the third shift?
9 A.     The entire time.
10 Q.     Did you have a supervisor when you worked
11 third shift in Cottage 1?
12 A.     In Cottage 1?
13 Q.     Yes.
14 A.     No, not until the end.
15 Q.     Which would have been what year?
16 A.     2006, February 2006 to -- from December,
17 came in December and I left, yeah, February.
18 Q.     So, shortly after 1999 when you went to
19 Cottage 1, until December of 2005 --
20 A.     Okay.  Well, now --
21        MR. NEEDLEMAN:  Mr. Gonzales
22 hasn't finished his question.
23 A.     I'm sorry, go ahead.
24 Q.     All I am trying to figure out is the

16

1 names of the different supervisors you had when
2 you worked at Cottage 1.
3 A.     Oh, on third shift?
4 Q.     Yes.
5 A.     None, there was none.  We were on our
6 own; it was just two of us.
7 Q.     Okay.  Who was Julius Anon?
8 A.     He was a supervisor of mine.
9 Q.     Was he in Cottage 1?
10 A.     He wasn't stationed -- was he stationed
11 in Cottage 1?  Did I say he was stationed in
12 Cottage 1?
13 Q.     I am just asking you.  I can't testify
14 for you.
15 A.     Because what we had was a third shift
16 supervisor who would come into the buildings and
17 check the buildings at night but if Julius was
18 there -- something wrong with my memory.  He
19 couldn't have been there very long.  Was he
20 there?  Oh, yes, he was.
21 Q.     Okay.  So you did have a supervisor?
22 A.     Yes, but I don't think he was there very
23 long.
24 Q.     Okay.  Before Julius, did you have a

17

1 supervisor in Cottage 1?
2 A.     No.
3 Q.     Okay.  How many people worked on the
4 third shift in Cottage 1?
5 A.     Karen Wynn and me.  Oh, and the
6 part-timers.
7 Q.     How many part-timers worked on the third
8 shift at any one time?
9 A.     They came and go so quickly, you know, I
10 would say two.
11 Q.     So in any given shift, from 10:00 p.m. to
12 6:00 a.m., it would be you, Karen Wynn and two
13 part-timers, is that correct?
14 A.     At least, yeah, interchanging for each
15 weekend.
16 Q.     So you would have four total employees
17 working on the third shift in Cottage 1?
18 A.     No, no way.
19 Q.     How many total employees worked the third
20 shift in Cottage 1?
21 A.     If you were lucky you would have two on
22 your side -- wait a minute.  It never happened
23 that way because I had the -- depended on the
24 ability of the clients.  The clients that I had

5 (Pages 14 to 17)

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

## SHEILA SEENEY

---

**18**

1 were the clients that needed more care, then
2 that's where the extra worker would be.
3 Q.      All right.  How many clients were in
4 Cottage 1?
5 A.      Eight on each side, so 16.
6 Q.      Say that again.
7 A.      Eight on my side and eight on the other
8 side, which would be 16.
9 Q.      And your side was side "A" or side "B"?
10 A.     In this building I was side "B".
11 Q.     So you had eight clients on side "B" and
12 eight clients on side "A" in Cottage 1, correct?
13 A.     Yeah, but Karen Wynn had those -- when I
14 first started the cottages I had both sides but
15 Cottage 1 they did have another worker on "A"
16 side.
17 Q.     Let's focus on Cottage 1 because that's
18 where Mr. Kamara worked and the basis of your
19 lawsuit is allegations of incidents that occurred
20 in Cottage 1 so I would like you, for the
21 purposes of these next series of questions, to
22 focus on Cottage 1.
23 A.     Okay.
24 Q.     In Cottage 1 was there an "A" side and a

---

**19**

1 "B" side?
2 A.      Yes.
3 Q.      And were there eight clients on the "A"
4 side and eight clients on the "B" side?
5 A.      Yes.
6 Q.      And which side were you assigned to?
7 A.      I was assigned to "B" side.
8 Q.      Okay.  And Karen was assigned to the "A"
9 side?
10 A.     Yes, uh-huh.
11 Q.     During the third shift, did you ever have
12 part-timers that worked on the shift?
13 A.     Oh, yes, we had part-timers.
14 Q.     Right.  But did the part-timers work
15 every shift or did it depend on the level of care
16 needed by the clients?
17 A.     Were they there every shift every day?
18 Q.     Yes.  What I am trying find out, maybe I
19 am not asking --
20 A.     They have a choice, they would give the
21 part-timers a choice of three days or four days.
22 So I can't always say to you -- no, it wasn't
23 always someone there; they always tried to
24 basically have the part-timers there when I was

---

**20**

1 off or when Karen was off.  Like, Karen and I
2 couldn't both have the same weekend off so when I
3 was off then the part-timer would be on Karen's
4 side and then when I was off the part-timer would
5 be on my side.
6 Q.      So, during a third shift there would
7 typically be just two employees working total on
8 that shift?
9 A.      Yeah, most of the time.  Yes, bad weather
10 and all, yes.
11 Q.     And the part-timers would simply fill in
12 for you or Karen when you were on vacation or
13 sick or could not work the shift for whatever
14 reason?
15 A.     Right.
16 Q.     Cottage 1, how many floors is that?
17 A.     One, one floor.
18 Q.     And in addition to the rooms that the
19 clients slept in, where their beds were, were
20 there any other rooms in Cottage 1?
21 A.     Other than the bedrooms?  They have the
22 living room area, the kitchen area, storage area.
23 They had a living room up front, then they had a
24 rec room on the side, a big rec room for them on

---

**21**

1 the side, and that was the same on each side.
2 Q.      So "A" side had its living room and "B"
3 side had its living room?
4 A.      Yes.
5 Q.      So the residents from "A" and "B" side
6 didn't typically commingle in one living room?
7 A.      Well, they could because they would walk
8 back and forth; you couldn't say no you have to
9 stay in your own area.
10 Q.     How about food, where did the residents
11 eat?
12 A.     Well, they each had their own kitchen;
13 staff did all the cooking and shopping, too.
14 Q.     When you say "staff", who do you mean?
15 A.     First and second shift.
16 Q.     Now, during third shift did you a provide
17 any meals for the clients?
18 A.     No, they would say we missed a snack or
19 something, you know, you would give them a snack,
20 it was okay.
21 Q.     During the third shift was there any type
22 of recreational activities that were provided?
23 A.     Yeah, but that was all on first and
24 second shift.

---

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

SHEILA SEENEY

22

1 Q.     Listen to my question.  I am talking
2 about third shift, did you or Karen have to
3 provide any recreational activities or supervise
4 any recreational activities to the clients on the
5 third shift?
6 A.     No, they prefer them to be in bed.
7 Q.     During the time that you worked in
8 Cottage 1, can you tell me what were your duties
9 and responsibilities?
10 A.     On third shift?
11 Q.     Yes.
12 A.     Quite a bit.  Well, I had eight clients
13 in the end; I started off with a lot more clients
14 than that when I first came and was basically
15 checking on them at night; some of my clients had
16 seizures so then you would have to check certain
17 clients for seizures.  Then you would have
18 clients who wet the bed constantly.  I had one
19 boy who was 10 or 11, then I had a little boy who
20 would sleep on the floor, just would not stay in
21 the bed, so I had to try to keep him in bed.  I
22 had one boy badly schizophrenia, he didn't sleep
23 well at all.  And then I had two boys who
24 sexually acted out.

23

1        So, I had a lot to keep my eyes on, plus,
2 I had the cleaning in the kitchen, we had to make
3 sure the kitchen stayed clean and the
4 refrigerators and the countertops and the sinks.
5 We are supposed to mop the floors and all the
6 paperwork.  Of course we will keep a, you know,
7 write any clients that got up or any problem that
8 they may have during the night.
9 Q.     Would you record that in the logbooks?
10 A.     In the logbooks.
11 Q.     Any other responsibilities that you had?
12 A.     Basically I tried to make sure the
13 clients were all quite in bed.
14 Q.     Were all of the clients boys or was it
15 mixed?
16 A.     The last building it was all boys.
17 Q.     Again, all my questions are Cottage 1.
18 A.     Oh, okay.  You are right.  I am mixing
19 the clients.
20 Q.     That's okay.  In Cottage 1 were all of
21 the clients --
22 A.     So Cottage 1 in the back I had a deaf
23 client, one deaf client, one in a wheelchair.
24        MR. NEEDLEMAN:  Sheila, I don't

24

1        mean to cut you off, I think Mr. Gonzales
2        was asking were they all boys.  Right?
3            MR. GONZALES:  Yeah.
4            THE WITNESS:  No.  As I get
5        towards the front, there is Nancy, I
6        remember Nancy; I had another girl, they
7        pulled her out to another building, she
8        wanted to go to another building and they
9        had -- the thing of it was, yeah, they
10        combine the boys and the girls, too, so I
11        think I ended up with two girls; they are
12        not girls really, they were women.
13 BY MR. GONZALES:
14 Q.     That's my next question.  What was the
15 age range of the clients?
16 A.     This group of clients were, their age
17 range, say, middle 30s, 40s, 50s, 60s.  I don't
18 know.  I don't remember because some of them look
19 a little older than they really are.
20 Q.     Right.  You mentioned there was a boy
21 that was like nine or ten years old?
22 A.     Oh, that was Cottage Three.
23 Q.     Well, in Cottage 1, did you have any
24 children?

25

1 A.     No, I'm sorry.
2 Q.     That's all right.  So they were all
3 adults, some men and some women, correct?
4 A.     Yes.
5 Q.     So, the responsibilities that you
6 described for me, checking on them during the
7 night for seizures, seeing if they wet the bed,
8 things like that, that would apply to Cottage 1,
9 correct, as well as the other cottages you may
10 have worked at?
11 A.     True, very true.
12 Q.     Was there anything in that list of duties
13 and responsibilities that you did not have to do
14 in Cottage 1?
15 A.     I had a girl in a -- I forgot, she was
16 only -- she slept with a ventilator.
17 Q.     In Cottage 1?
18 A.     In Cottage 1.  I can't remember her name.
19 Q.     Now, I had asked you before about whether
20 or not you had any supervisors in Cottage 1.
21 A.     And you are right about Julius.
22 Q.     Right.  Let me ask the question first.
23 When you started working in Cottage 1, was it you
24 and Karen that worked at the same time?

7  (Pages 22 to 25)

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

SHEILA SEENEY

26

1 A. Karen wasn't there, it was another lady.
2 Q. All right. And when you and this other
3 lady started working in Cottage 1, was there a
4 supervisor that was assigned to Cottage 1?
5 A. No, they didn't have supervisors then.
6 Q. Who did you report to then?
7 A. They always had another department where
8 they stayed, it was on grounds, and you would
9 call them on the phone.
10 Q. And were they your supervisor?
11 A. Yeah, they would be and then they got
12 away from that and then there was a period where
13 we didn't have any supervisors -- oh, I know how
14 it went. The supervisor would come from another
15 building. I'm sorry, it's just I haven't been
16 there in quite a while.
17 Q. Sure.
18 A. So this supervisor would come from
19 another building.
20 Q. What building was that?
21 A. I don't remember because I don't remember
22 the supervisor.
23 Q. What year was that?
24 A. I don't remember, sorry.

27

1 Q. When did you first get assigned to a
2 supervisor who was responsible for and was
3 present in Cottage 1?
4 A. It must have been Julius.
5 Q. And what year was that?
6 A. I don't remember; it's probably in 2000,
7 somewhere in 2000, on.
8 Q. Okay. And how long was Julius your
9 supervisor?
10 A. That, I am not remembering.
11 Q. Okay. Who replaced Julius, if anyone?
12 A. It must have been shortly after that came
13 Luseni Kamara.
14 Q. Now, when Julius was your supervisor, did
15 he have an office?
16 A. I think Julius came from another building
17 I am pretty sure but his office must have been
18 with us for a while, but I really -- I know
19 Julius worked -- I don't know where Julius came
20 from, I am sorry.
21 Q. That's okay.
22 A. I don't remember.
23 Q. It's fine. Did he work or have a table
24 or a desk in Cottage 1 where he would do his

28

1 paperwork?
2 A. Oh, there was a main office and that's
3 normally where Julius would stay.
4 Q. Where was the main office located?
5 A. As soon as you walked through the double
6 doors there was the office.
7 Q. In Cottage 1, correct?
8 A. All the cottages.
9 Q. Forget about the other cottages. Cottage
10 1, did Julius have an office in Cottage 1?
11 A. Yeah, when he is there they would, you
12 know, the supervisor would consider that his
13 office.
14 Q. And you could use that office as well to
15 do paperwork, correct?
16 A. Staff had to, there was no other place
17 for us.
18 Q. And when you had to sign in and sign out,
19 you would go to that office, correct?
20 A. All staff, yes.
21 Q. The logbooks were kept in that office,
22 correct?
23 A. Yes, uh-huh.
24 Q. Now, when the supervisor Julius worked in

29

1 Cottage 1, do you know whether he also had to
2 supervise any other buildings?
3 A. That's true, uh-huh.
4 Q. Yes, he had to?
5 A. Yes, he did.
6 Q. Do you know what other buildings he
7 supervised?
8 A. No, I don't remember that.
9 Q. So, was it typical that on the third
10 shift Julius wouldn't spend the entire night in
11 the office in Cottage 1?
12 A. Yeah, that's why I pretty much missed
13 seeing Julius. Yeah, he was quite.
14 Q. Well, is it because Julius would have to
15 go to these other buildings?
16 A. Yes.
17 Q. So, he wouldn't be spending the entire
18 third shift in Cottage 1, he would go to the
19 other buildings where he was supervising,
20 correct?
21 A. Correct.
22 Q. Do you know who Julius' boss was?
23 A. No, I don't.
24 Q. Have you ever heard of a woman by the

8 (Pages 26 to 29)

30

1 name of Maryanne Booth?
2 A.    Oh, okay.  She was his?
3 Q.    I am asking you.  I can't testify.  Do
4 you know whether Maryanne Booth was --
5 A.    Was Julius'?  No, I can't say.
6 Q.    Do you know who Julius' boss was?
7 A.    No, I didn't even realize Maryanne Booth
8 was here during Julius.
9 Q.    When do you remember Maryanne Booth
10 coming?
11 A.    Luseni Kamara.
12 Q.    When Luseni came over?
13 A.    Yes, yeah.
14 Q.    Now, while you worked the third shift and
15 Julius was your supervisor, did Mr. Kamara also
16 work in Cottage 1 on a different shift?
17 A.    Yes.
18 Q.    What shift did he work on?
19 A.    Second shift.
20 Q.    Was he the supervisor of the second
21 shift?
22 A.    Yes, uh-huh.
23 Q.    Do you remember when he became the
24 supervisor of the second shift?

31

1 A.    No, I just know he was there; I don't
2 remember when, no.
3 Q.    So the second shift would be the shift
4 that comes before your shift, correct?
5 A.    Yes.
6 Q.    It would end at ten o'clock p.m.?
7 A.    Yes.
8 Q.    They would leave and then you would take
9 over?
10 A.    Yes.
11 Q.    Have you heard of a woman by the name of
12 Debra Potts?
13 A.    Yes.
14 Q.    And who was she?
15 A.    Was she assistant unit director to
16 Maryanne Booth?
17 Q.    Yeah, that's my understanding, but is
18 that your recollection?
19 A.    That's my recollection.
20 Q.    Was Debra there before Maryanne took
21 over?
22 A.    Debra was at Elwyn, I believe, before
23 Maryanne Booth but I couldn't, you know, say one
24 hundred percent.

32

1 Q.    All right.  Did you have any interaction
2 with Miss Potts before Luseni became your
3 supervisor?
4 A.    No.
5 Q.    Did you have any dealings with Maryanne
6 Booth before Luseni became your supervisor?
7 A.    Other than me writing complaints and
8 giving them to Debra Potts; I gave some
9 complaints to Debra Potts and the shop steward,
10 yes, so she gave them to Maryanne Booth.
11 Q.    Right, but were these complaints that
12 occurred before Luseni became your supervisor?
13 A.    Yes, one was.
14 Q.    And what was that complaint about?
15 A.    That first complaint, that was about the
16 client left in feces.
17 Q.    Right, that's the October 2005 incident?
18 A.    Yes.
19 Q.    And I will ask you questions about that.
20 Did you ever have any contact with Maryanne Booth
21 before the October 2005 incident regarding the
22 client and the feces?
23 A.    No.  One morning she got out of her car
24 and she said she was the new supervisor and that

33

1 was the only contact I had then.
2 Q.    All right.  Had you ever filed any
3 complaints or made any complaints about Julius?
4 A.    I think I wrote one complaint about
5 Julius.
6 Q.    And what was that complaint about?
7 A.    Julius, it was a snowy night, another
8 snowy night; Julius wanted to pull me out of the
9 building and send me to another building which
10 wouldn't be within the union rights or whatever,
11 I don't know.  For some reason Julius, I think,
12 that night didn't want to make his rounds on the
13 outside so he stayed in the building, sent me to
14 another building.  If you have the paperwork on
15 it I could tell you.
16 Q.    That's okay.  And then you complained to
17 the union about that?
18 A.    Yes.
19 Q.    And that complaint may have been brought
20 up with Maryanne Booth at some point, is that
21 correct?
22 A.    I don't remember who I gave the paperwork
23 to.  I don't know.
24 Q.    Okay.  Now, what is Julius' race, do you

9  (Pages 30 to 33)

SHEILA SEENEY

34

1 know?

2 A.    He is African.

3 Q.    He is an immigrant from Africa in other
4 words?

5 A.    From Africa.

6 Q.    And Miss Booth, what's her race?

7 A.    Miss Booth, she is white.

8 Q.    Miss Potts, what's her race?

9 A.    She is black.

10 Q.    And Mr. Kamara, what is his race?

11 A.    He is -- I don't know what part of Africa
12 but he is from Africa.

13 Q.    He is an African immigrant as well?

14 A.    Yes.

15 Q.    You alluded to this but I just want to
16 ask you, were you a member of the union when you
17 worked at Elwyn?

18 A.    I didn't; I was made to be, yes.

19 Q.    When did you become a member of the
20 union?

21 A.    As soon as I applied for a job they told
22 me I had to be with the union.  See this union, I
23 don't know, was with my other union with the
24 county so I was disillusioned with this union

35

1 because they found -- third shift they said
2 wasn't qualified to find jobs for and they found
3 jobs for the first and second shift but not for
4 third shift and I worked third shift.  So when I
5 went to Elwyn I was surprised to see we had the
6 same union.  So I didn't want to be in the union.

7 Q.    When they closed the county building the
8 union wasn't able to find you --

9 A.    Third shift workers, and the third shift
10 workers had the longer years there.

11 Q.    That was the same union, SEIU?

12 A.    Yes.

13 Q.    After Miss Booth became the program or
14 unit director, which included Cottage 1, do you
15 know, were any changes made to the duties and
16 responsibilities of the residential life
17 counselors?

18 A.    From a third shift I could only tell you;
19 not in the beginning.

20 Q.    At any time, were you requested to do
21 more work than you were requested to do before?

22 A.    Only when -- yes, uh-huh.

23 Q.    After Miss Booth took over, were there
24 concerns that were raised by the various

36

1 employees and the union about the increased work
2 that was being requested of the employees?

3 A.    Yes, I believe so.

4 Q.    Okay.  And did you participate in any of
5 those efforts by the union to raise these
6 concerns with management?

7 A.    With the union?

8 Q.    Yeah.

9 A.    I think I put in complaint but not for
10 that, no.

11 Q.    Were you aware that the union was raising
12 these concerns with management about the new job
13 listing of job duties and things like that?

14 A.    No, I did not know.  That's news, no.

15 Q.    How does the union work?  I mean, do you
16 have a representative in the union or a shop
17 steward that you can go to if you have complaints
18 or issues?

19 A.    Yes.  Sometimes you are allowed to choose
20 a union person to represent you.  In my case,
21 Maryanne Booth did not let me choose my union
22 shop steward to represent me, each time I was
23 assigned, but once by Maryanne Booth, she calls
24 me on the telephone, says I have a shop steward

37

1 here for you, Sheila, it's Frances Bradley is
2 going to be your shop steward.  I said, well, I
3 didn't want Frances Bradley as my shop steward
4 because she was also involved in the incident
5 with the client with the feces.  Then, again,
6 Luseni Kamara, my very last night at Elwyn, did
7 the same thing, he didn't let me choose my shop
8 steward.

9 Q.    Did you raise that concern with the
10 union?

11 A.    My very last night there, no, I did not
12 have time for that.  I did call her from there at
13 six a.m. but he would not let me stay.  He sent
14 me home at four; I asked him to let me stay until
15 six to talk to the shop steward and he said no.

16 Q.    That wasn't my question.  My question was
17 did you raise any complaint or concern that you
18 were not allowed to choose your shop steward at
19 these two instances you described?  Did you ever
20 complain about that to the union?

21 A.    The first one concerning the feces, no.

22 Q.    Frances Bradley was the shop steward
23 then?

24 A.    Okay.  No, I did not.  I just -- I did

**10  (Pages 34 to 37)**

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

SHEILA SEENEY

38

1 talk to a shop steward but she said well, Sheila,
2 they will have to have a -- what is it called? A
3 hearing? You can discuss it then.
4 Q.      All right. I don't understand that
5 answer. My question was did you go to the union
6 and complain to them that you could not choose a
7 shop steward for either of the two incidents that
8 you have described?
9 A.      The last incident, no, because I had put
10 in my retirement letter but the first time, no, I
11 just mentioned it to a shop steward, no.
12 Q.      Prior to the incident of October 18th,
13 2005, with the client and the feces, did you have
14 any problems with Mr. Kamara?
15 A.      Uh-huh.
16 Q.      Is that a yes or a no?
17 A.      Yes, I'm sorry.
18 Q.      And tell me about those problems.
19 A.      This particular client who was a total
20 care client, he used a wheelchair, I was -- four
21 times previous to the one last time, he would
22 always be in left in feces and I would come on at
23 ten o'clock and, of course, I would check him.
24 He didn't have his staff clean the client.

39

1 Q.      Okay. My question was did you have prior
2 problems with Mr. Kamara?
3 A.      Then before -- could you give me that
4 question again, please?
5 Q.      Sure. I asked you did you have prior
6 problems with Mr. Kamara before the October 18th
7 incident and you were giving me an example of a
8 total care patient who was in a wheelchair who
9 you would come on duty at ten o'clock and find
10 that he had not been cleaned by the prior shift
11 and had feces on him?
12 A.      Yes.
13 Q.      Did you raise that concern with Mr.
14 Kamara?
15 A.      Oh, yes.
16 Q.      How many times?
17 A.      Every time up until the last time.
18 Q.      And how many times did that happen?
19 A.      The last time was five times.
20 Q.      So, five times before October of 2005 you
21 complained to Mr. Kamara?
22 A.      No, February, February 22nd would be the
23 fifth time. No, I'm sorry, you are right. Go
24 ahead. I have two big dates I have to remember

40

1 here.
2 Q.      This whole thing, I am not asking you
3 about specific dates or the allegations in your
4 complaint yet, what I am trying to find out is
5 whether or not you had any prior problems with
6 Mr. Kamara before he became your supervisor. So
7 I know that there was an incident in October of
8 2005, and we will discuss that. I am asking
9 before that.
10 A.      I think basically was about the client.
11 Q.      It was about the same total care client
12 who was not being cleaned by the second shift?
13 A.      Yes.
14 Q.      And how many times did you raise your
15 concerns about that client to Mr. Kamara?
16 A.      Each time.
17 Q.      And how many times was that?
18 A.      Five times.
19 Q.      And was Mr. Kamara still in the building
20 when you made those five complaints?
21 A.      To talk to him, yes, he would be there
22 and in the beginning it was pointing out, you
23 know, more or less it was pointing out the
24 client, you know, so and so is in feces.

41

1 Q.      And what did Mr. Kamara say when you
2 pointed that out to him?
3 A.      Towards the end he was saying I don't
4 want -- I don't need to see it, I don't need to
5 come and check it, you know.
6 Q.      How about the first time, what did he
7 say?
8 A.      It was more or less not much stated just
9 other than, oh, he is, you know.
10 Q.      Who worked the second shift in Cottage 1
11 when you worked there?
12 A.      That was Luseni Kamara.
13 Q.      He is the supervisor, but who were the
14 employees that worked, who were the residential
15 life counselors?
16 A.      That I cannot remember.
17 Q.      Did you have any overlap when the third
18 shift came on? Did you have any interaction with
19 the second shift employees?
20 A.      Yeah, when you come in at ten o'clock and
21 everybody is heading for the door, basically when
22 the staff clears, sometimes you realize that
23 things aren't quite right.
24 Q.      Listen to my question.

**11 (Pages 38 to 41)**

SHEILA SEENEY

42

1          MR. NEEDLEMAN:  That's not what
2     Mr. Gonzales asked.  Please try to listen
3     to his questions.
4 BY MR. GONZALES:
5 Q.     I don't mean to interrupt but if you
6 focus on my questions, it might go quicker and
7 get to the bottom of your case.
8          My question was a very simple one:  Did
9 you ever, during the time you worked in Cottage
10 1, have any interaction, for example, at shift
11 change, with the employees who worked the second
12 shift?
13 A.     Yes, I tried to.
14 Q.     And when you did that, did you know who
15 they were?
16 A.     Of course I would know who they were.
17 Q.     Do you remember who they are today?
18 A.     No, I don't.  When you work a lot of
19 buildings and then staff changes a lot.
20 Q.     So, the first time that this incident
21 happened with the client, you reported it to Mr.
22 Kamara, correct?
23 A.     Yes.
24 Q.     All right.  And did he do anything, to

43

1 your knowledge, to resolve the problem?
2 A.     Well, I was hoping that he would call his
3 staff.
4 Q.     I wasn't asking what you hoped he would
5 do; my question is what did he do, if you know?
6 A.     Nothing.
7 Q.     Okay.  Did you report that to his
8 supervisor that Mr. Kamara ignored your complaint
9 about the second shift not taking care of the
10 client?
11 A.     I would have the third shift logbook,
12 that's what we were supposed to write in.
13 Q.     You would put an entry into the third
14 shift logbook that a client had not been
15 appropriately cleaned by the second shift?
16 A.     Right.
17 Q.     Other than putting a notation in the
18 logbook, did you personally write a memo, send an
19 e-mail, phone call or approach the unit director,
20 the boss of the supervisors, to report about this
21 problem?
22 A.     About that client, no.
23 Q.     How about to report the fact that Mr.
24 Kamara wasn't doing anything about it?

44

1 A.     I had a report, I did write a report
2 about the client, I believe.
3 Q.     And when did you write that report?
4 A.     In fact, I think I sent it to
5 unemployment compensation.
6          MR. NEEDLEMAN:  When did you
7     write it, when?
8          THE WITNESS:  That must have
9     been in 2006.
10 BY MR. GONZALES:
11 Q.     Okay.  My questions are before Mr. Kamara
12 became your supervisor.
13 A.     Well, the same paperwork was given to my
14 shop steward, not to Maryanne Booth, no.
15 Q.     Okay.  Was paperwork given to your shop
16 steward?
17 A.     Paperwork was given to my shop steward.
18 Q.     Before Mr. Kamara became your supervisor?
19 A.     On some things.
20 Q.     Do you understand what I am saying?  Here
21 is what I am asking you:  I am asking you about
22 problems that you had, if any, with Mr. Kamara
23 before he became your supervisor.
24     So, you are working third shift, he is

45

1 the second shift supervisor and I am asking were
2 there any problems that you had with him before
3 he became your supervisor.  And you have told me
4 that there was this problem with this client who
5 was not being cleaned appropriately by staff on
6 the second shift and he was the supervisor.
7 A.     Right.
8 Q.     And that you complained to him on
9 approximately five different occasions about the
10 failure of the second shift to clean this client?
11 A.     Yes.
12 Q.     So, it's my understanding from your
13 testimony, however, that Mr. Kamara never took
14 care of that problem because it was continuing to
15 happen?
16 A.     No, he never took care of that problem.
17 Q.     Right.  So then my follow-up question to
18 that was did you take it a step further by going
19 over his head or going to the union or going to
20 someone to complain that Mr. Kamara was not
21 addressing this problem with the client?
22 A.     That's the reason we have logbooks.
23 Q.     No, no.  You are not answering my
24 question.  Listen to my question.  I am going

12 (Pages 42 to 45)

SHEILA SEENEY

---

**46**

1 have the court reporter read the question back
2 and I want you to answer my question.  Thank you.
3          (At this time, the court
4      reporter read back from the record as was
5      requested.)
6 Q.    That's the question I want you to answer.
7 A.    I guess not.
8 Q.    Okay.
9 A.    I am not going to say absolutely not.
10 Q.    Okay.  Now, let's talk about the incident
11 of October 18th, 2005, which is the incident with
12 the client, I think his name was Bruce?
13 A.    Wechsler.
14 Q.    Okay.  What time did you typically report
15 for work?
16 A.    Ten o'clock.
17 Q.    And when you would first come in, you
18 would park your car, I assume, correct?
19 A.    Yes.
20 Q.    Where would you park your car?
21 A.    Out front.
22 Q.    And then you would go where?  I am not
23 familiar with the parking situation.
24 A.    In fact, the parking is right in front of

---

**47**

1 Cottage 1.
2 Q.    Great.  You park your car and then where
3 do you go?
4 A.    Into the building.
5 Q.    And once you go in the building, where do
6 you go?
7 A.    Straight to "B" side.  Oh, sometimes I
8 stop in the office and swipe in.
9 Q.    Okay.  You should be doing that --
10 A.    For every night, not sometimes.
11 Q.    All right.  But that's what you did?
12 A.    Yes.
13 Q.    Every night you would come in and you
14 would swipe on the machine that's in the office?
15 A.    Right.
16 Q.    And Karen would do that as well?
17 A.    Yes.
18 Q.    Let's say you were wearing a coat or you
19 had a jacket, where would you put that?
20 A.    Well, nobody hung up, at least third
21 shift didn't, I didn't hang up a coat.
22 Q.    Where would you put it?
23 A.    On a chair.
24 Q.    In the office?

---

**48**

1 A.    No.
2 Q.    Where?
3 A.    On my side, "B" side.
4 Q.    Somewhere either in the kitchen or living
5 room?
6 A.    Probably would be on the dining room
7 chair.
8 Q.    Okay.  So did you carry a purse or
9 anything?
10 A.    We always have had a night shift bag or
11 something.
12 Q.    Where would you put that?
13 A.    It would be with me because I had books
14 or a magazine or something if there was a slow
15 time but there never was.
16 Q.    So you come in October 18th around ten
17 o'clock, right?
18 A.    Yes.
19 Q.    All right.  Was anybody in the office
20 when you came in?
21 A.    October 18th?
22 Q.    Yes.
23 A.    Luseni Kamara.
24 Q.    He was in the office?

---

**49**

1 A.    Yes.
2 Q.    Was anyone else in the office?
3 A.    Not to my memory.
4 Q.    Now, when you would typically come on
5 duty and you would swipe your card, put your
6 personal belongings down, what would be the first
7 thing you would do when you would come into work?
8 A.    I would, especially when Luseni Kamara
9 was on, I would check Bruce.
10 Q.    He would be the first client you would
11 check?
12 A.    Yes.  His room was in the very first
13 room; in fact, he had the room to his self.
14 Q.    Say this again?
15 A.    For a long time Bruce had the room --
16 most clients had to have two in a room but Bruce,
17 because, you know, he was total care, he had the
18 room to his self.  I think they said his father
19 preferred it that way.
20 Q.    On a typical night the first client you
21 check would be Bruce's room, correct?
22 A.    Yes.
23 Q.    Assuming Bruce did not need to be changed
24 and was clean, and that did happen, right, there

---

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

SHEILA SEENEY

50

1 were times where Bruce was not soiled?
2 A.    Yeah, of course there used to be some
3 times.
4 Q.    Okay.  So on those nights when he wasn't
5 soiled, what would be the next thing you would
6 do?  You checked on Bruce then what would you
7 do?
8 A.    Then I would go to the next room and next
9 room and next room.
10 Q.    When you would go to check on the
11 clients, what would you do?  Tell me what was the
12 procedure.
13 A.    Well, it would depend on the client, what
14 clients needed to have done.
15 Q.    Give me an example.
16 A.    With this group there was a deaf client
17 back there, sometimes he would fall asleep with
18 his light on, check to make sure his light was
19 off.  Then there was one in the back could have
20 some bad nights, so you check to make sure he was
21 feeling good.
22 Q.    Were the clients typically awake at ten
23 o'clock?
24 A.    Oh, yeah, older clients, they have TVs in

51

1 their rooms.
2 Q.    And were a lot of them maybe watching TV?
3 A.    Yes.
4 Q.    And did they have remote controls or did
5 you have to control the channel for them?
6 A.    Some could and some couldn't.
7 Q.    Would you help them if they needed help?
8 A.    Yes.
9 Q.    After you would go through and check all
10 of the clients, what would be the next thing that
11 you would normally do?
12 A.    I would try to read the logbook.
13 Q.    To see what happened from the last shift?
14 A.    Yes.
15 Q.    All right.  Now let's talk about
16 October 18th, that night.  You come in, Mr.
17 Kamara is in the office; did you swipe that
18 night?
19 A.    Of course.
20 Q.    After you swiped, did you say anything to
21 Mr. Kamara before you went to see Bruce?
22 A.    What am I supposed to say?
23        MR. NEEDLEMAN:  Did you?
24        THE WITNESS:  I don't believe

52

1        so, I don't know, but the thing of it is
2        also when I come in I am expecting Bruce
3        to be messed.  So what am I --
4 BY MR. GONZALES:
5 Q.    Okay.  Look, I wasn't there, I don't
6 know, and you may not remember, which is totally
7 appropriate, I just want to find out what
8 happened, that's all, and only you know, not me.
9 So that's why I am asking.
10 A.    So I know I am going to find something
11 that's not good so I am not going to say hello,
12 good evening, because I know I'm going to find
13 something that needs to be done in Bruce's room.
14 Q.    Now, on October 18th after you swipe, put
15 your stuff down, you go into Bruce's room first,
16 correct?
17 A.    Yes.
18 Q.    When you went on duty on October 18th,
19 was any of the second shift, besides Mr. Kamara,
20 still in the building?
21 A.    No.  Frances Bradley, she left at the
22 nine o'clock.
23 Q.    How did you know that?
24 A.    They always tell me.  Well, who told me?

53

1 He told me.
2 Q.    Who told you?
3 A.    Well, Frances is not here.
4 Q.    When did he tell you that?
5 A.    I guess while he was sitting at the desk.
6 Q.    And that's Mr. Kamara, correct?
7 A.    Yes.
8 Q.    Did you see the other second shift
9 worker?
10 A.    The building -- in fact, all the lights
11 was out, you know, it was just -- if they leave
12 an hour early they will try to turn all the
13 lights out, make everything quite, like nothing
14 is going on.
15 Q.    Now, the first person you check on is
16 Bruce, correct?
17 A.    Yes.
18 Q.    Tell me what you saw and what happened.
19 A.    Oh, I have all the paperwork.
20 Q.    I know, I have seen it and I've read it
21 but I want you to tell me what happened.
22 A.    Oh, this is four years ago so you can
23 help me fill it in.  I went back and he is laying
24 in feces and I took down the diaper, the feces

14 (Pages 50 to 53)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

**SHEILA SEENEY**

54

1 was between his legs.  So, you know, if the
2 client is pretty well settled into this feces,
3 you know he has been laying in it quite a long
4 time.
5       So, you know, I went back to tell him,
6 you know, Bruce is, you know, he is in feces
7 again.
8 Q.     You went back to tell who?
9 A.     Luseni Kamara.
10 Q.    And where did you go back to him in the
11 office?
12 A.    By then he was in the bathroom.  So I
13 waited for him to come out the bathroom, I said I
14 will stand here.
15 Q.    Before you went to tell Mr. Kamara about
16 this, did you do anything to clean Bruce up?
17 A.    Why would I do that?
18 Q.    My question wasn't why you did anything,
19 I just want to know what happened.  So my
20 question is before you went to tell Mr. Kamara
21 what you saw, did you do anything to clean up
22 Bruce?
23 A.    Normally what you do is --
24 Q.    That's not my question.  My question is

55

1 what did you do, if anything, that evening, not
2 what you normally do.
3 A.    First of all, the supplies needed to
4 clean him up was not there.
5 Q.    My question wasn't -- I am not asking you
6 about supplies, what you could have done, what
7 you should have done; I am asking what did you
8 do, if anything, that evening?
9 A.    No, because the supplies was not there to
10 do it.
11 Q.    So you did not clean or attempt to clean
12 Bruce up before you went to tell Mr. Kamara?
13 A.    Because the supplies was not there to do
14 it.  You had to go to the supply closet.
15 Q.    I understand, that's in your paperwork.
16 I want to know what happened though.  Can you
17 just answer my question?  When you went into
18 Bruce's room, did you attempt to clean Bruce up
19 before you went to report the situation to Mr.
20 Kamara, yes or no?
21 A.    It's impossible to do without us going to
22 the supply closet.
23 Q.    So you did not?
24 A.    No.

56

1 Q.     Now did you go to the supply closet
2 before you went to report to Mr. Kamara?
3 A.     Well, in this building, the supply closet
4 is on the "A" side, not --
5 Q.     Again, you are not answering my question.
6 You are giving an explanation of why you may or
7 may not have done something.  I want to know what
8 you did and you will be able to explain later.
9 A.     You need supplies to clean up a client,
10 any nurse in a hospital will tell you that.
11      MR. NEEDLEMAN:  Mr. Gonzales,
12 not to interrupt, maybe we can each take
13 a step back here.  Miss Seeney, if you
14 need to explain why your answer is what
15 it is, that's fine, but Mr. Gonzales is
16 entitled to an answer as well.
17      THE WITNESS:  I will give him
18 the right answer.
19      MR. NEEDLEMAN:  It's not right
20 or wrong, just give whatever the answer
21 is and if you need to explain why,
22 explain why; is that fair?
23      MR. GONZALES:  Absolutely,
24 that's is what I am expecting that you

57

1       would do.
2 BY MR. GONZALES:
3 Q.     You testified that you went in, saw that
4 he had been soiled, it appeared he had been
5 laying in his excrement for some time; you could
6 not clean him up at that time because there were
7 no supplies to do that and the supplies were kept
8 in the supply closet, correct?
9 A.     Correct.
10 Q.    Now, did you go to the supply closet to
11 get the supplies to clean Bruce before you went
12 to report to Mr. Kamara?
13 A.    Well, you know, since Mr. Kamara was
14 sitting there the whole hour while his client sat
15 in feces, I thought maybe he would want to offer
16 to help me.
17      MR. NEEDLEMAN:  Did you or not?
18 Did you go to the supply closet first or
19 no?
20 A.    I need a key, I had to get the key.  He
21 has the key.
22 Q.    So, throughout the third shift you would
23 not have access to the supply closet without Mr.
24 Kamara?

**15  (Pages 54 to 57)**

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

58

1 A.     There was no key for third shift.
2 Q.     Okay.  So you could not get anything from
3 the supply closet without Mr. Kamara -- listen to
4 my question, wait until I finish asking it before
5 you give an answer.
6        When you worked third shift and you
7 needed supplies from the supply closet, could you
8 access the supply closet and get those supplies
9 without getting the key from Mr. Kamara?
10 A.    Not in this particular month in time, no,
11 I needed the key.
12 Q.    When did it become necessary to get the
13 key?  In other words, was there a time before
14 October 18th, 2005, where you could have access
15 to the supply closet without the key?
16 A.    Yes.
17 Q.    When did it become necessary to have the
18 key to get into the supply close?
19 A.    With each supervisor, each unit director,
20 things change.
21 Q.    And when did things change on shift three
22 Cottage 1 concerning the supply closet?
23 A.    It must have been with Maryanne Booth, I
24 don't.  You know, when you are on third shift

59

1 things just -- new things fall into place without
2 an explanation.  So, all of a sudden the key
3 disappeared.  Oh, I know.  A staff would
4 accidentally take it home so then the rest of the
5 staff would have to do without the key.  You
6 would have to go to the supervisor.
7 Q.     And when did that start?
8 A.     Whenever the key would be missing.  If
9 the key would be missing, then they would not
10 supply you with a new key right away or whatever.
11 Q.    When did the key go missing before
12 October 18th?
13 A.    That question I cannot answer you, I
14 would just come in on third shift and the key
15 would be missing.
16 Q.    So it's your testimony on October 18th
17 the key was missing, therefore, you couldn't go
18 to the supply closet without going to Mr. Kamara
19 first, correct?
20 A.    This particular night because so much was
21 needed, no, I needed the key.
22 Q.    Okay.  Now, when you went to the bathroom
23 where Mr. Kamara was --
24 A.    He went to the bathroom, yeah, go ahead.

60

1 Q.     You waited for him to come out?
2 A.     Yes.
3 Q.     And what did you say when he came out of
4 the bathroom, if anything?
5 A.     I said, well, Bruce is messed again.
6 Q.     Did you say that to him or did you simply
7 motion with your finger to --
8 A.     Yeah, because he was like, you know, he
9 would fly off the handle.
10 Q.    Which way was it?  Did you say something
11 to him or did you simply --
12 A.    He knew what I meant.
13 Q.    Listen to my question.  Just answer my
14 question.  Did you say something to him or did
15 you simply motion with your finger to follow you?
16 A.    I motioned with my finger.
17 Q.    So you did not say anything to him at
18 that time?
19 A.    No.
20 Q.    Did he follow you?
21 A.    Yes.
22 Q.    Where did you go?
23 A.    To Bruce's room.
24 Q.    What happened when you got into Bruce's

61

1 room?
2 A.     Well, the first time we went to Bruce's
3 room Bruce was laying in the feces.
4 Q.     And what happened?
5 A.     Well, he says -- oh, I know what he said.
6 Well, it must have just happened is what he said,
7 it must have just happened, but it indicated that
8 because this feces was very, very loose feces,
9 was so much up between his legs and around his
10 hips that it didn't just happen.
11 Q.    Okay.  So what happened next?
12 A.    So, I said, I told him I needed the key.
13 I think I asked him to help me, I don't know.
14 Q.    Okay.  Then what happened?
15 A.    I went to the supply closet and he
16 followed me, he stood there, opened it with the
17 key.  So I saw a lot of stuff that we needed on
18 the second -- first and second shift are supposed
19 to replace because they know third shift is going
20 to have a hard time getting into the closet.  So
21 I got out a lot of stuff that I needed for my
22 side and by the time I got back Bruce had it all
23 over.
24 Q.    Had the feces all over?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

SHEILA SEENEY

62

1 A.     All over.
2 Q.     So when you went into the supply closet,
3 were you getting supplies just to clean Bruce or
4 were you getting other supplies that you were
5 going to need for the shift?
6 A.     Yes, Bruce needed more diapers, you know.
7 Q.     Okay.  I think my question was an
8 either/or.  Did you get materials or supplies
9 that you just needed -- listen to my question.
10 When you are talking and I am talking, she has
11 got to take down both of us and it's impossible.
12 Wait until I finish asking the question, you will
13 get plenty of opportunity to answer.
14       When you went to the supply closet with
15 Mr. Kamara, did you just get the supplies you
16 needed to clean Bruce or did you also try and get
17 supplies that you generally needed for the shift?
18 A.     For the shift.
19 Q.     Okay.  What supplies did you need to
20 clean Bruce?
21 A.     Well, you need more diapers because he
22 needs more changes later, but you need the wipes.
23 Wipes is okay once you first catch the bowel
24 movement but once he had it in his beard, he had

63

1 it in his mouth, he had it all over him, wipes
2 aren't -- wipes don't do it.  You need a shower.
3 You need a bath.
4       I am trying to think what other things I
5 had to do during the night.
6 Q.     No, no, no.  My question was what
7 supplies did you get from the closet for Bruce to
8 clean Bruce?
9 A.     Yeah.  Oh, just for Bruce?
10 Q.     Just for Bruce; diapers, wipes, anything
11 else?
12 A.     Diapers, wipes, and I am quite sure there
13 was something else.  Oh, to run the washer, soap,
14 more soap, sometimes I run in and the soap is not
15 there.
16 Q.     Okay.  In Bruce's room were there any
17 wipes in his room when you first went in there?
18 A.     Sometimes.
19 Q.     That night when you went in there were
20 there wipes in his room?
21 A.     That particular night there was nothing.
22 Q.     No wipes?
23 A.     That I can remember.
24 Q.     Okay.  Were there any diapers in there?

64

1 A.     Sometimes it might be one diaper and I
2 don't like one diaper.
3 Q.     Not sometimes.  That night, were there
4 diapers in there?
5 A.     For me to take that particular night to
6 take extra supplies out of the supply closet it's
7 because it was needed.
8 Q.     I am not asking about the extra supplies,
9 I am asking you were there any diapers in Bruce's
10 room when you went there that night?
11 A.     I believe not.
12 Q.     Okay.  That's all.  That's all I am
13 asking.  In addition to the wipes and the
14 diapers, what other supplies did you take from
15 the closet that night when you went with Mr.
16 Kamara?
17 A.     At this year in time I don't remember.
18 Q.     Okay.  When you got the supplies, what
19 did you do next?
20 A.     Oh, then he started yelling, that's when
21 he started yelling.
22 Q.     Who started yelling?
23 A.     Luseni Kamara.
24 Q.     While you were at the supply closet?

65

1 A.     No, when we got back to Bruce's room.
2 Q.     Okay.  So as soon as you get into Bruce's
3 room, before you do anything, Mr. Kamara begins
4 to yell at you?
5 A.     Yes.
6 Q.     And what does he say?
7 A.     Look at Bruce, he was yelling look at
8 Bruce.
9 Q.     And anything else?
10 A.     Get that out of his mouth.
11 Q.     Anything else?
12 A.     Clean him up.
13 Q.     Anything else?
14 A.     Not at this time that I can remember.
15 Q.     Did you say anything to Mr. Kamara?
16 A.     What did I say to Mr. Kamara?  I told him
17 to remove it from his mouth because Bruce bites.
18 Just the month before a staff member got bit by
19 Bruce.
20 Q.     Did you raise your voice with Mr. Kamara?
21 A.     Only so he could hear me if I raised my
22 voice.
23 Q.     You said that he was yelling at you.  Was
24 he yelling at you because it was hard to hear him

**17 (Pages 62 to 65)**

SHEILA SEENEY

66

1 or do you believe that he was yelling at you --
2 A.    No, because he saw Bruce in the state he
3 was in.
4 Q.    Okay. What did you do next, if anything?
5 A.    I said well, get the Hoyer out. I wonder
6 why he is not getting the Hoyer out.
7 Q.    What's that, the lift?
8 A.    Yeah, they use it on first and second
9 shift; on third shift they never showed us how to
10 use it because we are not supposed to bathe a
11 total care client; he is about the size almost of
12 you, the top half, his legs are not normal size.
13 So, I knew I couldn't do it by myself. So I
14 asked him get the Hoyer.
15 Q.    And is that how you asked him, in that
16 tone of voice?
17 A.    I said, well, he needs the Hoyer.
18 Q.    Listen to my question. What tone of
19 voice did you use when you asked Mr. Kamara to
20 get the Hoyer?
21 A.    At this time I do not remember.
22 Q.    Did you yell at Mr. Kamara?
23 A.    I don't yell.
24 Q.    Did you raise your voice with him?

67

1 A.    Yeah, in order to -- hoping that he will
2 give the man a shower.
3 Q.    Is it your testimony you never yelled at
4 Elwyn?
5 A.    I never yelled at Elwyn?
6 Q.    Is that what you are saying?
7 A.    Very little if I yelled; especially I
8 never yelled at a client.
9 Q.    No, I am not talking about clients. How
10 about other employees or supervisors, you never
11 yelled at other employees or supervisors?
12 A.    Give me a name, please.
13 Q.    I am asking you. You just made a
14 statement I don't yell. My question is have you
15 ever yelled or raised your voice with a
16 supervisor or other employee at Elwyn?
17 A.    Very strong talking.
18        MR. NEEDLEMAN: Does that mean
19     you haven't yelled?
20        THE WITNESS: I don't believe I
21     yelled, no.
22 BY MR. GONZALES:
23 Q.    Okay. Let's go back to October 18th.
24 You asked Mr. Kamara to get the Hoyer; did Mr.

68

1 Kamara get the Hoyer?
2 A.    No, I was puzzled.
3 Q.    So what happened next?
4 A.    He is telling me to wash him from the
5 basin. The bedroom -- say this was the bed
6 (indicating), he wanted me to go to the bathroom
7 which would be right there, (indicating) wash him
8 out in the basin.
9 Q.    In other words, bring the basin into the
10 room or bring Bruce to the bathroom and wash him
11 in the basin?
12 A.    Oh, at that particular time I didn't ask,
13 all I heard was basin.
14 Q.    And then what happened?
15 A.    I went to call the on-call person to see
16 if I could get her to convince him to put him in
17 the Hoyer.
18 Q.    Okay. And did you call the on-call
19 person?
20 A.    Yeah.
21 Q.    Who was that?
22 A.    I don't know.
23 Q.    Was that before --
24 A.    Every night is different.

69

1 Q.    Before you went to call the on-call
2 person, did Mr. Kamara say anything else to you?
3 A.    Get that out of his mouth.
4 Q.    And did you?
5 A.    No, I didn't. I told him -- I think I
6 told him the best way to do that would be put him
7 in the shower and give him a cup and let him spit
8 it out because he is a biter; he should have
9 known he is a biter.
10 Q.    Did anything else happen before you went
11 to call the on-call?
12 A.    I don't know about that because I went to
13 the office and in order to make a phone call --
14 Q.    Before you left the room to go call the
15 on-call, did anything else happen in Bruce's
16 room? Did Mr. Kamara say anything else to you,
17 did you say anything else to Mr. Kamara or have
18 you told me everything that happened in that
19 room, including everything that was said between
20 you and Mr. Kamara?
21 A.    Well, where I was and what was said I am
22 not sure but at one time he told me to say home
23 but I am not sure if I was in the office or I am
24 not sure if I was in the bedroom but I could look

18 (Pages 66 to 69)

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

## SHEILA SEENEY

**70**

1 at my papers.

2 Q.      Right now I am trying to get your
3 recollection.  Have you told me as fully and
4 completely everything that happened in Bruce's
5 room before you went to call the on-call?

6 A.      As far as I know.

7 Q.      Okay.  Where did you go to call the
8 on-call?

9 A.      You have to go to the office.

10 Q.      And is that where you went?

11 A.      Yes.

12 Q.      While you went there, what was Mr. Kamara
13 doing, if anything?

14 A.      He was standing in the room when I left.

15 Q.      Was he doing anything to clean Bruce?

16 A.      I thought he went to clean Bruce but he
17 didn't.

18 Q.      Why do you say that?

19 A.      Because he called Karen Wynn over to do
20 it.

21 Q.      When did he call Karen?

22 A.      I am on the phone and I believe he went
23 passed the window, there is a glass windows like
24 this.  (Indicating.)

**71**

1 Q.      So it was while you were on the phone
2 with the on-call?

3 A.      Yes.

4 Q.      And you could hear him calling for Karen?

5 A.      I don't know how he got Karen.

6 Q.      How do you know he was asking for Karen?

7 A.      Because she let me know.

8 Q.      After the fact?

9 A.      She -- I don't know whether I was on the
10 phone at the time; she says he called me over
11 here, I got enough over there.

12 Q.      Did you physically hear Mr. Kamara
13 calling Karen to help him with Bruce?

14 A.      I don't know if he went over to her or
15 whether he called her.

16 Q.      Listen to my question.

17 A.      No, I didn't.

18 Q.      Did you hear Mr. Kamara call Karen to
19 help him with Bruce?

20 A.      I was on the phone, no.

21 Q.      So the answer is no, correct?

22 A.      No.

23 Q.      All right.  When you were on the phone,
24 tell me what happened when you called the on-call

**72**

1 as fully and completely as you can recall.

2 A.      What she said?

3 Q.      Everything that you said and everything
4 that she said.

5 A.      Very little.  I was shocked.  She didn't
6 know me.  I didn't know who she was.  I believe I
7 woke her and she really didn't seem interested.

8 Q.      And what did you say to her?

9 A.      Then she says just do as he tells you to
10 do.

11 Q.      What did you say to her when you called
12 her?

13 A.      I said Bruce needs to shower, Bruce
14 Wechsler needs to shower, and I said I am trying
15 to convince Luseni Kamara to give him a shower, I
16 said will you please talk to him.  She says I
17 don't need to talk to him, just do as he tells
18 you.

19 Q.      The on-call told you to do what Mr.
20 Kamara told you to do, is that correct?

21 A.      That's correct.

22 Q.      And what did Mr. Kamara tell you to do?

23 A.      Wash him from the basin.

24 Q.      Okay.  And did you do that?

**73**

1 A.      No.

2 Q.      Did Karen do that?

3 A.      No.  To my knowledge, no.

4 Q.      Who did?

5 A.      I mean she didn't -- she washed him from
6 the basin but she didn't give him a shower.

7 Q.      Right.  Karen washed Bruce from the
8 basin?

9 A.      Yeah.

10 Q.      Which is what Mr. Kamara asked you to do,
11 correct?

12 A.      Yes, yes.

13 Q.      Who told you to go home that night?

14 A.      Luseni Kamara.

15 Q.      When?

16 A.      He said if you are not going to do the
17 work, you can go home, somewhere he threw that
18 in.

19 Q.      Was it before or after you went to call
20 the on-call?

21 A.      That, I don't remember.

22 Q.      Okay.  All right.  Did Karen say anything
23 else to you other than what you already testified
24 to?

**19 (Pages 70 to 73)**

SHEILA SEENEY

---

74

1 A.    Did Karen say anything to me?
2 Q.    Yeah.
3 A.    She came out, yeah, she came out with
4 this huge rag, bath towel rag with feces all over
5 it.
6 Q.    Did she say anything to you?
7 A.    No, she didn't, but she was --
8 Q.    So you were still --
9            MR. NEEDLEMAN:  Let her finish
10       the answer.
11 BY MR. GONZALES:
12 Q.    Go ahead.
13 A.    She was implying that she was cleaning
14 him up from the basin.
15 Q.    Did she say anything to you?
16 A.    I said, Karen, can you wait; I do believe
17 I said can you wait until I find someone to
18 convince him to give him a shower.
19 Q.    And what did she say, if anything?
20 A.    Karen does what Karen wants to do.
21           MR. NEEDLEMAN:  Did she say
22       anything to you?
23           THE WITNESS:  No, not that I can
24       remember.

---

75

1 BY MR. GONZALES:
2 Q.    Okay.  This rag that was covered in
3 feces, did she come out of Bruce's room?
4 A.    Of course.
5 Q.    Do you have any reason to believe that
6 Karen did not clean Bruce?
7 A.    She said something about it took her
8 hours.
9 Q.    Did you leave that night?
10 A.    Yes, I left.
11 Q.    What time did you leave?
12 A.    I would have to look it up.
13 Q.    What would you look up to see?
14 A.    What time I left.  I think it was early,
15 maybe 12:00.
16 Q.    Did you swipe out or did you have to
17 record when you left?
18 A.    I have been sent home so many times I
19 don't remember.
20 Q.    What was the policy or was there a policy
21 if you left work, were you supposed to swipe out
22 or record the time that you left?
23 A.    Well, if you wanted to get paid, you
24 know, you would swipe out hoping to get paid or

---

76

1 whatever.
2 Q.    Okay.  Other than the on-call and Mr.
3 Kamara and Karen, did you speak with anyone else
4 at Elwyn that night?
5 A.    No.
6 Q.    Did you speak to anyone from the union
7 that night?
8 A.    No, because it's 11, 12 o'clock.
9 Q.    Do you remember what day of the week that
10 was?
11 A.    It was in the middle of the week, I
12 believe.
13 Q.    Were you scheduled to work the next
14 night?
15 A.    I believe I was.
16 Q.    Did you come into work the next night?
17 A.    I may have called off sick, I am not
18 sure.  I tried to look it up.
19 Q.    What was the next contact you had from
20 anyone at Elwyn?
21 A.    They don't contact me.
22 Q.    Did you have contact with them?
23 A.    Oh, the next contact probably was when
24 Maryanne Booth called me at home Friday morning.

---

77

1 Q.    So, if that night was some time during
2 the week, you left early October 18th; did you
3 work October 19th?
4 A.    No, I was hoping my lawyer would get some
5 information on it.
6 Q.    Do you recall?
7 A.    But I know I was docked one or two days.
8 Q.    I know that too and we will talk about
9 that and we will get your pay records that will
10 show the times that you worked, but my question
11 is do you recall whether you came to work the
12 next day?
13 A.    I don't believe so.
14 Q.    And do you know why you didn't come to
15 work the next day?
16 A.    If I didn't come to work the next day it
17 was because I felt that Elwyn had let me down
18 again.
19 Q.    Okay.  You said the next time that you
20 probably had any communication from anyone at he
21 Elwyn was when you had a conversation with
22 Maryanne Booth, is that correct?
23 A.    Yeah, she called me on the home phone.
24 Q.    And what did she say when she called you?

---

20 (Pages 74 to 77)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

SHEILA SEENEY

**78**

1 A.      She said I am suspending you. She said I
2 have Frances Bradley here, Sheila, and I am going
3 to suspend you, will you please come over and
4 pick up the suspension letter.
5           MR. GONZALES:  Off the record.
6           (At this time, a discussion was
7      held off the record.)
8 BY MR. GONZALES:
9 Q.      October 18, 2005 was a Tuesday.  Tuesday,
10 October 18th, 2005, does that sound about right?
11 A.      Okay.  I know it was in the middle of
12 the week.
13 Q.      All right.  And then you would have -- so
14 you wouldn't have come to work on Wednesday the
15 19th and you said you got a phone call on Friday?
16 A.      I think Fridays were my day off then.
17 Q.      Did you work weekends on the third shift?
18 A.      Yeah, so I had to work that weekend.
19 Q.      Now, tell me about the phone call with
20 Maryanne Booth and I have Friday as -- I have a
21 calendar for October of 2005; it looks like the
22 18th was a Tuesday, Friday would have been the
23 21st; does that sound about right?
24 A.      Yes.

**79**

1 Q.      Now, Maryanne -- so you didn't come to
2 work on Wednesday or Thursday or Friday, the
3 19th, 20th or 21st, correct?
4 A.      No, I worked; it was a day or two in
5 there I worked.
6 Q.      Okay.
7 A.      I worked at least two days there.
8 Q.      So you believe you worked Wednesday and
9 Thursday and Friday was your normal day off?
10 A.      Friday was my normal day off.  I know I
11 worked some days there because I had told the
12 shop steward, I said, she has docked me.  I said,
13 I already worked.  She suspended me on days I
14 worked, how can that be.
15 Q.      That's all well and good, but I am trying
16 to find out what days you believe you worked.
17 You didn't work on the 18th except for the hour
18 or so that you came in before you were sent home.
19 So then Wednesday the 19th, do you believe that
20 you worked the next day?
21 A.      I can't recall.  I tried to find a
22 calendar and I just can't recall.
23 Q.      Did Mr. Kamara tell you to go home and
24 not to return until notified otherwise?

**80**

1 A.      No, he doesn't say it that way, he will
2 just tell you to go.
3 Q.      So he never told you you were not to come
4 back until you were told otherwise?
5 A.      Well, once you leave Elwyn grounds or you
6 are escorted off --
7 Q.      Listen to my question.  I am not
8 interested in what the general policy was, I am
9 interested in what he said, if anything.  Did he
10 say that you were to go home and not to come back
11 until told otherwise?
12 A.      No, he doesn't state it that way.
13 Q.      Did he give -- how about the gist of it;
14 in other words, he may not have used the words
15 that I used but did he basically tell you in so
16 many words that you were not to return until you
17 were contacted by someone from Elwyn?
18 A.      Someone else may do it that way but not
19 -- no, not Luseni Kamara, no.
20 Q.      So you get a phone call from Maryanne
21 Booth; what did she say?
22 A.      She said, Sheila, I am really kind of
23 surprised.  She said, I have Frances Bradley here
24 and she is going to be your shop Steward and I

**81**

1 said I don't want Frances Bradley as my shop
2 steward; she said I am going to suspend you for
3 three days for not following Luseni Karmara's
4 directive.  I think I talked to her about it and
5 I am quite sure I mentioned that he didn't get
6 his shower, you feel that --
7 Q.      The first contact you had with Maryanne
8 Booth you believe was a telephone call to your
9 home on Friday the 21st, is that correct?
10 A.      Yes, I believe it was that same day that
11 she wanted me to come in because I said -- I
12 mentioned that it's a half hour drive.
13 Q.      All I want to know is when the phone call
14 happened right now.
15 A.      You want to know the day of the phone
16 call?
17 Q.      Yes.
18 A.      I believe it was a Friday.  It could have
19 been Saturday.  Was it Friday?
20 Q.      I am asking you; if you don't remember
21 you can tell me.
22 A.      If you have the paperwork on it.
23 Q.      Well, I do, but I don't want to put words
24 in your mouth.  Miss Booth says she scheduled a

**21 (Pages 78 to 81)**

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

SHEILA SEENEY

82

1 meeting with you on Friday at nine in the
2 morning.
3 A.    Nine in the morning?
4 Q.    Yes.  And that you should bring Frances
5 Bradley with you.
6 A.    I should bring --
7 Q.    That's what she says.  Now, did that
8 happen, did she say that to you?
9 A.    Absolutely not.
10 Q.    Okay.  Did you have an in-person meeting
11 with Miss Booth on Friday?
12 A.    She called me from home, she says I have
13 Frances here with me, wherever she was, and
14 Frances even got on the phone, and she said she
15 wanted me to come to Elwyn to pick up my
16 suspension letter.  The only thing was I didn't
17 know where she was.  I went in and I said I am
18 going to go straight to administration building.
19 So I went straight to the administration
20 building.
21 Q.    Miss Booth in her memo says that she
22 called you at noon on October 20th which would
23 have been --
24 A.    Noon?

83

1 Q.    Yes, on Thursday, with Frances Bradley in
2 the office to inform you that you have been
3 suspended and to set up a meeting for the
4 following day on Friday; does that ring a bell?
5 A.    That could be correct.
6 Q.    Okay.  And did you come in for a meeting
7 on Friday?
8 A.    I did come in for the meeting.
9 Q.    All right.  Now, again, Miss Booth says
10 that the meeting occurred with Cheryl Reaves, not
11 with Frances Bradley; does that ring a bell?
12 A.    Yeah, because I called Cheryl Reaves.
13 Q.    Because you didn't want to have Frances
14 Bradley as your shop steward?
15 A.    No, I didn't want Frances.
16 Q.    That was accommodated, correct?  Cheryl
17 Reaves did serve as your shop steward at the
18 meeting with Miss Booth?
19 A.    Only because --
20 Q.    I am not asking about why, I am asking
21 did that happen?
22 A.    Yeah, it happened.
23 Q.    Okay.  Now, the meeting that took place
24 with you, Miss Booth and Miss Reaves occurred in

84

1 the administration building, is that correct?
2 A.    Right, yes.
3 Q.    Now, did you provide Miss Booth with a
4 written statement about the incident of
5 October 18th during that meeting?
6 A.    She notified me on Thursday.  No.
7 Q.    What?
8        MR. NEEDLEMAN:  She answered no.
9        MR. GONZALES:  No?
10       THE WITNESS:  No.
11 BY MR. GONZALES:
12 Q.    Did you ever provide a written statement
13 about the incident?
14 A.    What puzzles me is usually there is a
15 meeting such as this where for other staff
16 members to -- just as you are asking me questions
17 right now.  So I am thinking maybe they are going
18 to have a meeting over this.  Why would I call a
19 meeting?
20       MR. NEEDLEMAN:  Did you ever put
21    anything in writing?
22       THE WITNESS:  She has given me a
23    suspension letter.  The normal procedure
24    at Elwyn is to have an investigation and

85

1    call all that are involved.
2       MR. GONZALES:  Let's mark this
3    as Seeney-1.
4       (At this time, a document was
5    marked for identification as Exhibit No.
6    Seeney-1.)
7       MR. GONZALES:  Miss Seeney, I am
8    handing you a document which is two pages
9    typewritten and appears to have your
10   signature on Page 2.
11 BY MR. GONZALES:
12 Q.    Did you prepare this document?
13 A.    Yes.
14 Q.    Why?
15 A.    Why?  Where is the top of it, I could
16 tell you why.
17       MR. NEEDLEMAN:  Why don't you
18    take a minute and review it.
19       THE WITNESS:  Yeah, I see this
20    but it's not the complete -- not the
21    whole complete thing.
22 BY MR. GONZALES:
23 Q.    What's missing?
24 A.    If I had the top of it I could tell you.

22 (Pages 82 to 85)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

86

1 Q.    What's on the top?
2 A.    So what are you asking me?
3         MR. NEEDLEMAN:  What are you
4 saying is missing from the top?
5         THE WITNESS:  Is this one of my
6 complaints?
7 BY MR. GONZALES:
8 Q.    I am asking you.  I believe that this was
9 prepared and provided to Elwyn at the meeting
10 with Maryanne Booth.
11 A.    No, this wasn't given to Maryanne Booth;
12 if it got to Maryanne Booth it went through Debra
13 Potts.  Yeah, this went through the union.  I
14 gave it to the union people, shop steward Cheryl
15 Reaves.
16 Q.    Did you discuss this document with Cheryl
17 Reaves?
18 A.    Normally -- I would be leaving at
19 6:00 a.m., she would be coming and I said I have
20 it in an envelope and I would give it to her.
21 Q.    When did you prepare it?
22 A.    I know -- I'm sorry about the dates but I
23 didn't know I would be in district court.
24 Q.    Okay.  I don't know the answer to that

87

1 question then.  You don't remember?
2 A.    You said when did I prepare it?
3 Q.    Yeah.  And your answer is?
4 A.    I have some dates on the papers like
5 this.  So I have 10/18 at the top.  Yes, 10/18.
6 Q.    No, no.  My question is when did you
7 prepare it?
8 A.    Very shortly after that, whenever I could
9 get a hold of my sister.
10 Q.    Why would you need to get a hold of your
11 sister?
12 A.    She does the typing for me.
13 Q.    So you dictated or you told her what you
14 wanted to say?
15 A.    I told her what happened, yeah.
16 Q.    And she typed it out for you?
17 A.    Yeah.
18 Q.    And then you signed it, correct, on Page
19 192?
20 A.    Yes.
21 Q.    That's your signature?
22 A.    Yes.
23 Q.    The handwritten portion just above your
24 signature, is that your handwriting?

88

1 A.    Yes.
2 Q.    All right.
3 A.    If it's signed -- to be signed I would
4 say it went to the union.
5 Q.    Right.  Did you ever provide this to
6 Maryanne Booth?
7 A.    Maryanne Booth received two or three of
8 these complaints.
9 Q.    I know.  We will talk about the other
10 complaints.  I am concerned about this complaint,
11 this document.
12 A.    I believe this one was given to Debra
13 Potts.
14 Q.    Is there some other written statement
15 that you provided to Maryanne Booth at your
16 meeting with her on October 21, 2005?
17 A.    Not to my knowledge because I didn't know
18 -- she only gave me 24 hours notice.  If you say
19 it was Thursday and I came Friday, I thought it
20 was the same day.
21 Q.    Your recollection is what I am trying to
22 find out; if your recollection is different from
23 Miss Booth's, that's fine, and then that will be
24 determined at another date by another person or

89

1 an entity.  I just want to find out what your
2 recollection is.
3         So, it's your recollection that you had a
4 phone call with Miss Booth but did not have an
5 in-person meeting with her?
6 A.    Only in the administration building.
7 Q.    But there was an in-person meeting with
8 her, correct?
9 A.    Yes.
10 Q.    Tell me as fully and completely as you
11 can recall what happened at the meeting.
12 A.    Not much.  They have -- it was a room
13 like this, bigger table and all, and I went in
14 there, waited for her to come over, I called her
15 building and she said where are you.  So I told
16 her I was in the administration building.  So she
17 came over.
18 Q.    Were you waiting with Miss Reaves or did
19 Miss Reaves come with --
20 A.    I called her and she came over.
21 Q.    Okay.  What happened when Miss Booth got
22 there?
23 A.    She said I am suspending you three days
24 and I said when does that start, tonight?  She

23 (Pages 86 to 89)

90

1 said, no, she gave me the dates.
2 Q.    So, you are telling me that Miss Booth
3 told you at the October 21st meeting that you are
4 suspended or did she call you later the next day
5 and tell you you were suspended?
6 A.    Okay.  She called me one day and she said
7 I am going to be suspended so come pick up your
8 suspension letter.  So then I came in to pick up
9 my suspension letter and I met her at the
10 administration building.  So I said for what days
11 am I suspended, and I said am I suspended tonight
12 and she said no, she gave me the dates.  So I
13 said I am working this weekend.  So I am thinking
14 maybe it's next week.
15 Q.    I am confused.
16 A.    You're confused.  She gave me suspension
17 days for days I had already worked.
18 Q.    When did she give you the suspension
19 letter?
20 A.    It had to be a Friday.  Did she say it
21 was a Friday?
22 Q.    No.
23 A.    She says it was a Thursday?
24 Q.    No.

91

1 A.    She says it was a Saturday?
2       MR. NEEDLEMAN:  John, is this
3 part of what is going to be produced?
4       MR. GONZALES:  Yes.
5       THE WITNESS:  This is four years
6 later.
7       (At this time, a document was
8 marked for identification as Exhibit No.
9 Seeney-2.)
10      THE WITNESS:  Let me see.  Okay.
11 Suspension days 18th, 19th, 20th.
12      MR. NEEDLEMAN:  Read the whole
13 thing, please, and let Mr. Gonzales know
14 when you are done.
15      (At this time, the witness
16 complies with request.)
17 BY MR. GONZALES:
18 Q.    Have you had a chance to review the
19 document?
20 A.    Yes.
21 Q.    This document has been marked Seeney-2,
22 it is an October 21st 2005 letter to you from
23 Maryanne Booth.  It states that you have been
24 suspended for three days based upon the incident

92

1 of October 18th.  It also says it was given to
2 you, see at the bottom, on October 22nd 2005 at
3 12:25 p.m., do you see that?
4 A.    Do I have 12:25 on my letters?
5       MR. NEEDLEMAN:  Don't worry
6 about that, just answer the question.
7       THE WITNESS:  I see what you
8 have.
9       MR. NEEDLEMAN:  Do you see where
10 it says that?
11      THE WITNESS:  I see what you
12 have.
13 BY MR. GONZALES:
14 Q.    Okay.  Do you recall this letter being
15 provided to you on October 22nd 2005?
16 A.    Yes.
17 Q.    Was it given to you in person or was it
18 mailed to you?  How did you receive it?
19 A.    At the administration building.
20 Q.    The letter in paragraph two says that you
21 are to return to work on your next scheduled
22 shift which is Saturday October 22nd at
23 ten o'clock p.m.; did I read that correctly?
24 A.    Yes.

93

1 Q.    And did you return to work on that date?
2 A.    Yes, I did.
3 Q.    Okay.  Did you file a grievance about
4 this?
5 A.    Yes, I did.
6 Q.    And who did you file the grievance with?
7 A.    Cheryl Reaves.
8 Q.    What was the outcome of that grievance?
9 A.    That's why I am here.
10      MR. NEEDLEMAN:  What was the
11 outcome?
12      THE WITNESS:  This, district
13 court.  There was no outcome.  There was
14 no --
15 BY MR. GONZALES:
16 Q.    Did you ever get a decision from the
17 union with respect to your grievance?
18 A.    Never, no one ever handed me anything.
19 Q.    Did you hand the union anything?
20 A.    I gave it to -- the only way that on
21 third shift I could get to the union, that I know
22 of, is through the shop steward and Cheryl Reaves
23 I thought was reliable.
24 Q.    Cheryl Reaves is the head of the union,

94

1 is she not?
2 A.    Is she now?  I didn't know that.
3 Q.    She wasn't the head of the union at the
4 time?
5 A.    No.
6 Q.    Did you give Cheryl Reaves a document
7 grievance form?
8 A.    Four, four complaints, yes.
9 Q.    Four complaints in October of 2005?
10 A.    Maybe not at that time.
11 Q.    Listen to my questions.  Did you file a
12 grievance about this incident in October --
13 A.    She said --
14 Q.    Listen to my questions, you are
15 interrupting.  Did you file a grievance about
16 this incident in October of 2005 with the union?
17 A.    Yes.
18 Q.    Who did you file it with?
19 A.    Cheryl Reaves.
20 Q.    Was there a handwritten or some sort of
21 written document that you filed the grievance
22 with?
23 A.    She said she would put it in for me.
24 Q.    Listen to me.

95

1 A.    I don't remember.
2 Q.    Did you prepare a written document that
3 you gave to the union?
4 A.    I did not prepare a written document, no.
5 Q.    So did you verbally request that the
6 union file a grievance on your behalf?
7 A.    Yes.
8 Q.    Did you ever follow up with the union to
9 find out if they did file a grievance?
10 A.    Well, she would indicate that they were
11 always behind in their grievance hearings.
12 Q.    I am not asking what their response to
13 you was, I am asking did you do anything to
14 follow up to see if they filed a grievance?
15 A.    How else would I do it besides going
16 through Cheryl Reaves?
17 Q.    I have no idea, that's why I am asking.
18 Did you go to Cheryl Reaves?
19 A.    Yes.
20 Q.    When?
21 A.    I can't give you the dates.
22 Q.    In 2005?
23 A.    2005, yes.
24 Q.    So you went to Cheryl Reaves to follow up

96

1 with her to find out if the union filed a
2 grievance on your behalf arising from this
3 October 2005 incident, correct?
4 A.    Yes.
5 Q.    Did they tell you that they did file a
6 grievance?
7 A.    I was going on the assumption that they
8 did.
9 Q.    I am asking for facts; did they tell you
10 that they filed a grievance?
11 A.    I couldn't give you -- I put a grievance
12 in.
13 Q.    You didn't, you verbally requested that
14 someone file a grievance, that's what you
15 testified to.
16 A.    Yes.
17 Q.    You didn't formally file anything with
18 anyone, correct?
19 A.    No.
20 Q.    For this incident, October of 2005, did
21 you prepare a written grievance form, go in to
22 Elwyn and hand it in to Mary Coick or some other
23 representative at Elwyn who handles grievances?
24 A.    Is Cheryl Reaves a shop steward?  That's

97

1 not the way?  If she is not the way, I didn't
2 know it.
3        MR. NEEDLEMAN:  Sheila, listen
4    to Mr. Gonzales' questions.
5        THE WITNESS:  I am listening.
6        MR. NEEDLEMAN:  Mr. Gonzales has
7    asked you did you ever fill out a
8    grievance form and handed it to somebody;
9    if you didn't, you didn't; if you did,
10   you did.
11       THE WITNESS:  I don't remember.
12 BY MR. GONZALES:
13 Q.    Okay.  Did you ever contact anyone at
14 Elwyn to follow up on your grievance from the
15 October 2005 incident?
16 A.    I would hear that there is a backlog.
17 Q.    Who did you speak with?
18 A.    Maybe I was talking to Cheryl Reaves and
19 I would ask.
20 Q.    Not my question.  My question is did you
21 go to anyone at Elwyn and follow up about your
22 grievance, not the union, Elwyn?
23 A.    Would that be human services?
24 Q.    Anyone at Elwyn, but not the union; it

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

SHEILA SEENEY

98

1 could be human services, it could be--
2 A.    I didn't know that I could do that, okay.
3 Q.    So the answer is you never went to anyone
4 at Elwyn?
5 A.    No.  Administration building, no.
6 Q.    Or any other building.
7 A.    Well, Pete Vitarelli, I would give him
8 complaints.
9 Q.    I am not asking about complaints, I am
10 asking about a follow up concerning your
11 grievance from the October 2005 incident; did you
12 contact anyone at Elwyn to follow up on the
13 status of your grievance?
14 A.    No.  Life gets busy.
15 Q.    Okay.  What was your grievance that you
16 told to Cheryl Reaves?
17 A.    That I worked three days and I was
18 docked.
19 Q.    Anything else?
20 A.    Oh, when you are on third shift she is on
21 her way to her building, I am leaving, not much
22 said.
23 Q.    But I am trying to find out what you did
24 say.

99

1 A.    I don't remember.
2 Q.    Okay.  Anything in writing that you
3 provided to Miss Reaves about your grievance?
4 A.    I gave her four complaints on Luseni
5 Kamara.
6 Q.    What four complaints?
7 A.    I gave them to Elwyn, four complaints to
8 Elwyn.
9 Q.    Other than those four complaints that you
10 gave to Elwyn, any other written complaints,
11 written documents, that you gave to Miss Reaves
12 about your grievance?
13 A.    To who?
14 Q.    Miss Reaves, Cheryl Reaves.
15 A.    The four complaints, no; just the four
16 complaints.
17 Q.    If you look at Seeney-1, again, which is
18 the two-page written document that you prepared;
19 is everything contained in that document true and
20 accurate to the best of your knowledge?
21       MR. NEEDLEMAN:  Read it again
22 before you answer.
23       THE WITNESS:  Well, I have
24 paperwork here that I can compare it to.

100

1       It looks like everything I typed, I mean
2 my sister typed.
3       MR. NEEDLEMAN:  I want you to
4 read the whole thing before you answer
5 Mr. Gonzales' questions because his
6 question is is everything that's
7 contained in there true and accurate?
8 Not what was typed but --
9       THE WITNESS:  True and accurate?
10 From my view, yes, that happened that way
11 that night, yes.
12 BY MR. GONZALES:
13 Q.    All right.  Other than the written
14 complaints that you submitted about Mr. Kamara,
15 were there any other complaints that you had
16 verbally reported to Elwyn about Mr. Kamara after
17 he became your supervisor?
18 A.    Oh, I had report to Anita Sammons, I
19 think that's her name; she came through one
20 night, late at night, 10 or 11 o'clock.
21 Q.    Who is a Anita Sammons?
22 A.    I don't know her title, I can't remember
23 it.  She works at Elwyn.  She is somewhere in
24 there with Maryanne Booth.

101

1 Q.    And what did you tell her?
2 A.    I said, after reporting Luseni Kamara for
3 sleeping, why was he put on this shift or
4 something.
5 Q.    What did she say?
6 A.    She said Maryanne Booth gave him a choice
7 of buildings to choose and he choose your
8 building.  So I said to her, well, does that mean
9 he is going to be able to send me home again.
10 And she said, no, he won't be able to send you
11 home again, Sheila.
12 Q.    Do you remember how soon after the
13 October 18th incident Mr. Kamara became the third
14 shift supervisor?
15 A.    It was like October and then
16 December 1st, December 1st.
17 Q.    What happened when he became the
18 supervisor; in other words, how were you notified
19 that Mr. Kamara was going to become the third
20 shift supervisor?
21 A.    There is no notice.
22 Q.    He just showed up for work one night and
23 he was there?
24 A.    Maybe I heard it from Karen.

**26  (Pages 98 to 101)**

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

SHEILA SEENEY

102

1 Q.    Okay.
2 A.    It wasn't -- must have been through
3 Karen; I don't see many people.
4 Q.    When Mr. Kamara became your supervisor on
5 the third shift, did he have any meetings or
6 discussions with you about his expectations, what
7 he expected of you and Karen?
8 A.    I am quite sure he did.
9 Q.    And tell me what you remember from that
10 meeting, if anything.
11 A.    Just that there would be some changes.
12 Q.    And what changes did he say there would
13 be?
14 A.    He said Maryanne Booth gave me the -- I
15 am not sure. I am not sure.
16 Q.    Any discussions about the fact that there
17 was going to be a little more strict application
18 of the rules or that more was going to be
19 expected of the third shift employees than had
20 been in the past, anything like that?
21 A.    I think I didn't -- if it was said that
22 way, I didn't take it as being me, okay.
23 Q.    I don't know what that means. What do
24 you mean?

103

1 A.    Well, I don't really remember exactly
2 what he said but he said very little.
3 Q.    Did you have any discussions with Miss
4 Booth about Mr. Kamara becoming your supervisor?
5 A.    Of course not.
6 Q.    How about Miss Potts, any discussions
7 with her?
8 A.    No.
9 Q.    Did they generally work during the day
10 shift?
11 A.    Yes, you didn't see them.
12 Q.    All right. After Mr. Kamara became your
13 supervisor, did you have any problems or issues
14 with him?
15 A.    Of course.
16 Q.    When was the first one?
17 A.    Well, it was kind of right off but I
18 can't say in what order, not after four years; I
19 would have to look at the paperwork.
20 Q.    Well, what's your recollection? What's
21 the first one that sticks out in your mind?
22 A.    What sticks out in my mind? Him trying
23 to set me up.
24 Q.    Okay. And what happened, how did he try

104

1 to set you up?
2 A.    By saying to get the supervisor to say
3 that I had left the building unattended.
4 Q.    When was that?
5 A.    It was in December, December 4th.
6 Q.    And what happened?
7 A.    I don't know. He just came in around --
8 what time was it, like 5:30, with the supervisor
9 and she stated that I had left the building
10 unattended.
11 Q.    Mr. Kamara came in with another
12 supervisor at 5:30 in the morning?
13 A.    Yes, her name was Aisha or something.
14 Q.    Where was she a supervisor?
15 A.    Elwyn.
16 Q.    In Cottage 1?
17 A.    This particular night it was a snowy
18 night and I have the story in there, it is a long
19 story.
20 Q.    I know, but what do you remember?
21 A.    Okay. So I was waiting, it was just me
22 for both sides, nobody in the building. So I
23 called her and I said can I go outside to clean
24 off my car. She said no. I said okay, I will

105

1 wait here. So then a worker came in for "A" side
2 and then a worker came in for "B" side. And then
3 she drove up in her car and I am outside cleaning
4 my car off and I said, you know, I said -- she
5 just said hi and I said bye.
6       So then, I don't know how many nights
7 after that, Luseni Kamara comes in the office at
8 5:30 in the morning with her and has her state
9 that I left the building unattended.
10 Q.    On the day that you went to clean your
11 car off, what time did you call Aisha?
12 A.    Oh, it was like -- it would be after
13 six o'clock, I normally waited until after six
14 o'clock to call; it was either five after, ten
15 after.
16 Q.    And your shift ended at what time?
17 A.    Six.
18 Q.    Why would you call somebody after your
19 shift ended if you were done for the day?
20 A.    I didn't leave. I just said -- it was a
21 big snowstorm and it was a lot of snow that
22 night.
23 Q.    I understand that, but you said that you
24 called after your shift ended for permission to

27 (Pages 102 to 105)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

SHEILA SEENEY

106

1 go clean your car off.  If your shift was over,
2 why did you need permission to go clean your car
3 off?
4 A.      I believe at that time there was no
5 coverage in the building.
6 Q.      So your shift had ended but the next
7 shift had not come on duty?
8 A.      Yeah.
9 Q.      And do you remember what -- you don't
10 remember what day that was, correct?
11 A.      December 4th, it was my brother's
12 birthday; yes, I remember that date.
13 Q.      So, you then waited for -- so you didn't
14 clean your car off, you waited for the first
15 shift to come on duty and then once they were
16 both there then you went out to clean your car?
17 A.      Well, then when it's like that snowy and
18 there is at least one person on each side, yes,
19 you can leave.
20 Q.      Are there normally more than one person
21 on a side during the first shift?
22 A.      It's the requirement that at least one
23 person is on each side.
24 Q.      During the first shift do they normally

107

1 have more than one person on each side?
2 A.      Yes.
3 Q.      How many people work on each side during
4 the first shift?
5 A.      It has to be more than one person, but
6 they are there to cover until the rest comes in.
7 Q.      My question is how many people work on
8 each side on the first shift normally?
9 A.      Maybe I didn't answer you because I don't
10 know, I am not sure.  I don't want to give the
11 wrong answer.
12 Q.      That's fine.  Is it more than one per
13 side?
14 A.      Yes, definitely in the daytime.
15 Q.      But you believe it was the policy at the
16 time that as long as there was one person who
17 showed up for work on the first shift per side,
18 you were able to leave?
19 A.      Yes, especially in bad weather.
20 Q.      Why especially in bad weather?
21 A.      Well, because people stagger in on bad
22 weather.
23 Q.      If there is bad weather it could be that
24 the first shift people can't get into work,

108

1 right?
2 A.      Yes.
3 Q.      So if they don't have the full complement
4 to work, it's your testimony though as the third
5 shift you were still able to leave, as long as
6 there was one person on each side?
7 A.      According to the union.  I checked with
8 Cheryl Reaves.
9 Q.      After you cleaned your car off that
10 morning and you saw Aisha, did you go back inside
11 the building or did you just leave?
12 A.      No, I had -- you know, I was ready to go.
13 Q.      Did you just go or did you go back in the
14 building?
15 A.      No, I had no reason to go back in the
16 building.
17 Q.      That's what I thought.  I wanted to ask
18 you what did you do.
19 A.      I think I swiped out and left and I was
20 outside and she comes driving up.
21 Q.      Okay.  Did you swipe out before or after
22 you cleared off your car?
23 A.      I swiped out and then I wiped off my car.
24 Q.      Okay.  So then the next thing is several

109

1 days later you have a meeting with Kamara, Mr.
2 Kamara?
3 A.      Yes.
4 Q.      And then what happened at that meeting?
5 A.      I don't recall the meeting.  I was
6 getting -- I had my coat on getting ready to go
7 and he was sitting -- she comes in and sits at
8 the desk, he sits on top of the file cabinet with
9 his feet dangling; he was behind me so I couldn't
10 really see him.
11         So then I told her well, you call -- it's
12 in my file, a really nice lady, she worked
13 part-time and she had retired.  So I said I will
14 call her and you can talk to her, I did not leave
15 the building unattended.  So I went and called
16 her because they had a list of phone numbers.  I
17 went to the kitchen and called her and asked her
18 to come listen on the phone.  She said, no, I was
19 here and so and so was on the other side.
20         Aisha, I believe her name was, she
21 wouldn't talk to Mrs. -- I can't remember her
22 name; she would have verified that I didn't leave
23 the building unattended.
24 Q.      The supervisor Aisha or Asia, whatever

28 (Pages 106 to 109)

SHEILA SEENEY

---

110

1 her name is, refused to talk to the employee who
2 came in to work on the first shift the day of
3 this incident?
4 A.     Right, who was there that day.
5 Q.     That you contacted to prove to them that
6 you didn't leave your shift and she was there?
7 A.     Right.
8 Q.     What happened after that?
9 A.     I said, you know, here is Mrs., would you
10 please talk to her on the phone.  And she said I
11 don't need to talk to her.  And then she said
12 something about nothing more will be said about
13 it or something such as that.
14 Q.     Okay.  And were you ever written up for
15 that?
16 A.     Not in paperwork, no.
17 Q.     Did you receive any suspension or
18 discipline?
19 A.     No.
20 Q.     Okay.  What was the next incident with
21 Mr. Kamara?
22 A.     Of course you went through Bruce
23 Weschler, I should have said that one first
24 really.

---

111

1 Q.     We talked about that, that's the
2 October 18th incident?
3 A.     Yes.
4 Q.     I understand.  What's the next incident?
5 A.     Just crazy little things, crazy stuff.
6 Q.     Such as?
7 A.     Well, no, this is not little.  He bumps
8 up against me in the hall in a threatening
9 manner.
10 Q.     I'm sorry.  The supervisor that had this
11 incident with you about cleaning your car off and
12 leaving early, what was her race?
13 A.     She is black.
14 Q.     Okay.  Now, you talk about this incident
15 where he bumped into you; how many times did he
16 bump into you?
17 A.     He did it one time because Debra Potts
18 came in, a very short meeting in the kitchen
19 right around the time I was going to go home, and
20 he was -- the office is here, kitchen here,
21 kitchen here.  He sees us in the kitchen --
22 Q.     You and Miss Potts?
23 A.     Yes.  So then when she leaves, it was a
24 ten-minute meeting, and I go to the laundry room

---

112

1 and I come out the laundry room and it's a
2 hallway like that.  (Indicating)  I come around
3 the hallway and he suddenly comes, meets me in
4 that hallway back there.
5 Q.     And, bumped into you?
6 A.     Yeah.
7 Q.     Did he push you down?
8 A.     No.  He went (indicating) you know.
9            MR. NEEDLEMAN:  Just made a
10 motion with your shoulder and elbow.
11            THE WITNESS:  Yeah, touched my
12 body.
13 BY MR. GONZALES:
14 Q.     You made a motion with your left --
15 A.     No, he did, not me.
16 Q.     No, you just now did --
17 A.     I am showing you what he did.
18 Q.     Exactly.  And I am trying to describe for
19 the record what you did because, otherwise, all
20 that we are going to read later is he bumped me
21 and he did this and nobody is going to know what
22 this is.  You are motioning with your left arm?
23 A.     Well, I was coming this way really and he
24 was on this side.  (Indicating)

---

113

1 Q.     So how did he bump into you?
2 A.     He is standing and I am standing.  He is
3 taller than me, I am sure.  He takes his body and
4 bumps up on my right side with his left side.
5 Q.     So his left side bumped into your --
6 A.     He would be -- I was coming so he
7 would -- so that would be that side.  I don't
8 know.  One of the sides.
9 Q.     Let's break it down.  You are walking
10 down the hallway, correct?
11 A.     Yeah, that way.  (Indicating)
12 Q.     Towards you?
13 A.     Yes.  And so he would be on this side.
14 (Indicating)
15 Q.     Wait a minute.  Let's do it this way.
16 You are walking down the hallway in Cottage 1?
17 A.     Yes.
18 Q.     He is walking towards you, is that
19 correct?
20 A.     Yes.
21 Q.     Was this around a corner or something?
22 Was he coming around a corner?
23 A.     Do you see that corner right there?
24 (Indicating)

---

29 (Pages 110 to 113)

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

SHEILA SEENEY

114

1 Q.    I do.
2 A.    I was up against the wall.  Say the
3 laundry room was in there, (indicating) so I came
4 out of the laundry room, he was -- it wasn't an
5 accident.
6 Q.    All right.  You are coming out of the
7 laundry room and Mr. Kamara walks around the
8 corner where the laundry room is?
9 A.    Yeah.
10 Q.    And he bumps into you at that point?
11 A.    He didn't bump.
12 Q.    He didn't bump into you?
13 A.    What I am saying is it wasn't an
14 accidental bump.
15 Q.    I understand that.  You've made the
16 accusation that he intentionally bumped into you,
17 I understand that, but I am trying to find out
18 from you exactly how it happened.
19        You are coming out of the laundry room
20 and he walks around a corner and he bumps into
21 you physically, correct?
22 A.    Yes.
23 Q.    What part of his body touched your body?
24 A.    So, that shoulder right there, that

115

1 shoulder. (Indicating)
2 Q.    You are pointing to my left shoulder?
3 A.    Yes.
4 Q.    So Mr. Kamara's left shoulder is what
5 bumped into you?
6 A.    Yes.
7 Q.    And what part of your body did he touch?
8 A.    He touched that part of my body but then
9 it was this part of his body which would be his
10 left.
11 Q.    So his left shoulder contacted your left
12 shoulder?
13 A.    Would be in this direction, (indicating)
14 would be my right shoulder.
15 Q.    No matter which way you are looking it's
16 still your left.
17 A.    Sorry, my left shoulder.
18 Q.    Mr. Kamara's left shoulder contacted your
19 left shoulder as you were coming out of the
20 laundry room?
21 A.    Right.
22 Q.    Did you fall over?
23 A.    No.
24 Q.    Did you fall down to the ground?

116

1 A.    No.
2 Q.    Did you hit your head anywhere?
3 A.    No.
4 Q.    Did he say anything to you?
5 A.    He looked down on me and when he did it
6 he looked like at my eyes.
7 Q.    I didn't ask you if he looked at you, I
8 asked you if he said anything to you.
9 A.    No, he did not.
10 Q.    It was totally silent?
11 A.    Yeah.
12 Q.    Did you say anything to him?
13 A.    Of course not, not in that position, no.
14 Q.    Did you stagger or were you able to keep
15 your balance?
16 A.    Yeah, I was able to keep my balance.
17 Q.    Where was he going, if you know?
18 A.    I didn't look, I didn't turn around and
19 look.
20 Q.    After he bumped into you, where did he
21 go?
22 A.    Down the hallway where the clients were.
23 Q.    And you believe that that was intentional
24 that he did that on purpose?

117

1 A.    It was definitely intentional.
2 Q.    Why do you believe it was intentional?
3 A.    Because I was talking to Debra Potts.
4 Q.    And any other reason why you believe it
5 was intentional?
6 A.    He thought I was talking about him.
7 Q.    Why do you believe that?
8 A.    Because there was a lot of things going
9 on, a lot of reports out, there was reports here
10 and --
11 Q.    Reports about what?
12 A.    And she was being very cool to him.
13 Q.    Reports about what?
14 A.    About his behavior.
15 Q.    What other reports about his behavior
16 were going around?
17 A.    The complaints that I had put in.
18 Q.    What other complaints?
19 A.    I put in four complaints.
20 Q.    You put in four complaints as of
21 December 4th when this incident happened?
22 A.    It was a lot that went on, as I said.
23 Q.    I know that, but you're not talking to --
24 A.    It could have been -- I don't know the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

SHEILA SEENEY

118

1 date of the bump.

2 Q.     You said December 4th earlier.

3 A.     No, that was for the --

4         MR. NEEDLEMAN:  I am going to

5         object to the form.  This is for

6         clarification; December 4th was the

7         incident with the feces.

8 BY MR. GONZALES:

9 Q.     I'm sorry.  What was the date of the

10 bump?

11 A.     I would have to look it up on here, one

12 of these papers.

13         MR. GONZALES:  Okay.  We will

14         mark this.

15         (At this time, a document was

16         marked for identification as Exhibit No.

17         Seeney-3.)

18             - - -

19         (At this time, a short break was

20         held.)

21 BY MR. GONZALES:

22 Q.     Miss Seeney, I have put a document in

23 front of you, it's two pages, it's marked

24 Seeney-3, typewritten; Page 2 appears to have

119

1 your signature.  Is that your signature on page

2 2?

3 A.     Yes.

4 Q.     Did you prepare this?

5 A.     Yeah, I told my sister what to type.

6 Q.     And she types it for you, correct?

7 A.     Yes.

8 Q.     What does your sister do for a living?

9 A.     My sister had many jobs with the

10 Philadelphia School System and last finished she

11 was a principal at Martha Washington for four to

12 six years.  I think it was six years.

13 Q.     How do you currently support yourself?

14 A.     Right now?

15 Q.     Yes.

16 A.     SSI.

17 Q.     Okay.  Disability or retirement?

18 A.     Just regular social security.

19 Q.     Okay.  Why did you prepare the document

20 that's marked as Seeney-3?

21 A.     Why did I prepare this?

22 Q.     Yes.

23 A.     Because of what happened.  Luseni Kamara

24 tried to set me up.

120

1 Q.     Well, I guess I am trying to find out did

2 somebody ask you to prepare this or did you do

3 this on your own?

4 A.     Several times Debra Potts would ask me

5 to.  In some of my statements I have where Debra

6 Potts has asked me; this one I don't have but she

7 asked me, but this one I gave to the union; all

8 of them I gave to the union.

9 Q.     Okay.  That's not my question.  My

10 question is why did you prepare this?  Did

11 somebody ask you to prepare this or did you do it

12 on your own?

13 A.     Yes, somebody asked me to prepare it.

14 Q.     Who asked you to prepare it?

15 A.     It interchanges, so I would say Debra

16 Potts and Cheryl Reaves.

17 Q.     Do you have a specific recollection that

18 Debra Potts and Cheryl Reaves asked you to

19 prepare this specific document?

20 A.     Say that again.

21 Q.     You are talking generalities that you

22 prepared several documents and that Cheryl and

23 Debra may have asked you to prepare different

24 ones.  I am asking about this document.  Do you

121

1 have a specific recollection about whether Debra

2 Potts and/or --

3 A.     Yes, it was Cheryl Reaves.  The reason I

4 say Cheryl Reaves because she was my shop steward

5 that day.

6 Q.     When did Cheryl Reaves request that you

7 prepare this?

8 A.     Normally she was there that day and she

9 probably told me to do it as soon as possible.

10         MR. NEEDLEMAN:  Do you know that

11         that's what happened or are you supposing

12         that that's what happened?  Only because

13         you said normally.

14         THE WITNESS:  It wasn't my idea

15         to sit down and put together this

16         complaint.

17         MR. NEEDLEMAN:  I am not asking

18         you about that.  I just don't want you to

19         guess at anything, that's all.

20         THE WITNESS:  All righty.  I was

21         asked; it was between Debra Potts and

22         Cheryl Reaves so I can't give you a

23         definite answer.

24 BY MR. GONZALES:

**31  (Pages 118 to 121)**

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

SHEILA SEENEY

122

1 Q.    When did you talk to Debra Potts about
2 Mr. Kamara?
3 A.    Let me see. I remember going over to
4 Debra Potts' office and dropping off one of
5 these, maybe two or three complaints, I can't
6 remember. I was at her office at least twice.
7 Q.    But you said you talked to her and she
8 told you to prepare a written report or a written
9 statement?
10 A.    Yes.
11 Q.    What did you talk to Miss Potts about
12 when she told you to prepare a written statement?
13 A.    Normally there is not much talking. She
14 said we are aware of Luseni Karmara's behavior.
15 Q.    Right. But what were you telling Miss
16 Potts that would lead her to say that they were
17 aware of his behavior?
18 A.    Most likely be talking to her about what
19 had just happened to me.
20 Q.    Okay. So you would have incidents with
21 Mr. Kamara, you would then go to Debra Potts or
22 Cheryl Reaves and complain to them about the way
23 Mr. Kamara was treating you?
24 A.    Yes.

123

1 Q.    They, in turn, would then say to you why
2 don't you prepare something in writing and submit
3 it to us and we will look into it?
4 A.    Yes.
5 Q.    And you did that, correct?
6 A.    Yes, I did it.
7 Q.    Then the union or management at Elwyn
8 would look into the complaints that you had made
9 against Mr. Kamara and then would they get back
10 to you with what happened?
11 A.    Of course not.
12 Q.    Okay. So, at no point they never, not
13 even once, got back to you about any of the
14 complaints you made about Mr. Kamara?
15 A.    Get back to me with encouraging words?
16         MR. NEEDLEMAN: How about just
17         respond to you at all.
18 BY MR. GONZALES:
19 Q.    Yeah. Hey, we talked to Mr. Kamara, we
20 told him to stop bothering you.
21 A.    Stop bothering me, no.
22 Q.    Or anything?
23 A.    No.
24 Q.    So you made a complaint and you never

124

1 heard anything from anyone again?
2 A.    Cross my heart hope to die.
3 Q.    Okay. How about when you complained that
4 he was sleeping, did you ever hear back from
5 anybody about that?
6 A.    No. I would just take my reports, they
7 would take my reports and they would just say,
8 you know, write it up. That's why I am here.
9 Q.    You know Mr. Kamara was suspended for
10 sleeping as a result of a complaint that you
11 made?
12 A.    Yes, I do.
13 Q.    How did you find it out?
14 A.    Because he wasn't there.
15 Q.    That's it? No one talked to you about
16 it?
17 A.    No, believe it or not. I said where is
18 Luseni Kamara, did they move him; no, it was
19 suspension.
20 Q.    Okay. Did Miss Potts ever talk to you
21 about any actions or discussions they had with
22 Mr. Kamara as a result of your complaints?
23 A.    In management, no. She said very little
24 in the kitchen. Basically they would state,

125

1 Sheila, we are aware of Luseni Kamara's behavior,
2 not much that encouraging; but, you know, write
3 it up, write it up. And I was aware that other
4 people, when there was incidents at Elwyn, they
5 would have meetings such as this. I have never
6 been involved. I think they had a fact finders,
7 that's what it was called; never invited to a
8 fact finders.
9 Q.    Who had a fact finders?
10 A.    Elwyn had a fact finders.
11 Q.    About what?
12 A.    Situations.
13 Q.    What situations?
14 A.    Any situation in general.
15 Q.    Situations concerning, for example, a
16 complaint of abuse of clients?
17 A.    Not -- staff such as Luseni Kamara or
18 other things.
19 Q.    So there were fact findings about Luseni
20 Kamara?
21 A.    I don't know. The way you just stated
22 it, I don't know if that would be concluded in
23 the fact finder.
24 Q.    I am lost.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

SHEILA SEENEY

126

1 A.     Well, I have always been lost.
2 Q.     When you say fact finding, what are you
3 referring to?
4 A.     Well, the investigation.
5 Q.     Investigation of who?
6 A.     To see maybe what Luseni Kamara is doing
7 on third shift, is he really bothering Sheila
8 Seeney, is he doing all this, she is giving us
9 these complaints, they called me in and --
10 Q.     Who called you in?
11 A.     Nobody ever called me in, they would just
12 come to the kitchen, come to the living room,
13 come through the building.
14 Q.     And speak to you and ask you to provide
15 them with written statements summarizing the
16 complaints you were making about Mr. Kamara,
17 correct?
18 A.     Yeah.  Years ago they used to call it --
19 you have to come off the third shift and go in
20 the day and they would gather you all together
21 and see what was going on; that was never done.
22 Q.     You mean have everybody come in as in Mr.
23 Kamara and you together?
24 A.     Well, I am saying in different

127

1 situations.
2 Q.     Well, I am not worried about other
3 situations, I am concerned about the complaints
4 that you have made.  I am trying to find out the
5 process or procedure that happened.  You would --
6 A.     There was none.
7 Q.     Listen to my question.  You would
8 verbally speak to Debra Potts about a complaint
9 about Mr. Kamara's behavior?
10 A.     Yes.
11 Q.     Miss Potts would ask that you prepare a
12 written document similar to the report that's
13 marked as Seeney-3?
14 A.     Yes.
15 Q.     And give it to her?
16 A.     Yes.
17 Q.     Or management?
18 A.     Yes.
19 Q.     And then management would look into the
20 situation?
21 A.     I don't know.
22 Q.     You have no idea?  You don't know whether
23 management looked into it or not?
24 A.     No.

128

1 Q.     And did you ever get a response from
2 management about the complaints that you made to
3 them about Mr. Kamara?
4 A.     Absolutely not, and if I had paperwork, I
5 would have it here.  No.
6 Q.     Okay.
7         (At this time, a document was
8     marked for identification as Exhibit No.
9     Seeney-4.)
10 BY MR. GONZALES:
11 Q.     Miss Seeney, we marked the next document
12 as Seeney-4.  I'll have you take a look at it.
13 This is also two pages.  Has your signature on
14 Page 2.
15 A.     Yes.  I probably gave it to the union or
16 Debra Potts.  I signed it.
17 Q.     First question is did you prepare this
18 document?
19 A.     Yes, I did.
20 Q.     Did your sister type it?
21 A.     She typed it.
22 Q.     And is that your signature on Page 2?
23 A.     That's my signature.
24 Q.     Is everything contained on Seeney-4 true

129

1 and accurate, to the best of your knowledge?
2 A.     Yes.
3 Q.     I didn't ask you this about Seeney-3;
4 could you just look back at Seeney-3.  Is
5 everything contained on Seeney-3 true and
6 accurate, to the best of your knowledge?
7 A.     Yes, as far as I can see.
8 Q.     Okay.  Did you submit any other written
9 reports concerning Mr. Kamara other than the
10 documents I have shown you, Seeney-4, Seeney-3
11 and Seeney-1.
12 A.     There should be four.
13 Q.     What was the fourth one about?
14 A.     I think that was about the laundry room.
15 Oh, and the client, yeah.  Yeah, this one here,
16 February 4th.
17 Q.     Number four, what does it say at the top?
18 How does it read?
19 A.     Do you have this one?
20     MR. GONZALES:  You are right, I
21     got it.  We will mark this one.
22         (At this time, a document was
23     marked for identification as Exhibit No.
24     Seeney-5.)

33 (Pages 126 to 129)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

SHEILA SEENEY

130

1 BY MR. GONZALES:

2 Q.      Miss Seeney, I put in front of you a

3 document which we marked as Seeney-5 which is a

4 February 4th 2006 letter signed by you.  Is this

5 the fourth complaint that you were referring to

6 earlier?

7 A.      Yes.

8 Q.      Other than these four written complaints,

9 were there any other written complaints that you

10 provided to management at Elwyn concerning Luseni

11 Kamara?

12 A.      Not Luseni Kamara, no, that I can

13 remember.

14 Q.      And is everything contained on Seeney-5

15 true and correct to the best of your knowledge?

16 A.      Yes.

17 Q.      How many times did you meet with Miss

18 Potts about Mr. Kamara?

19 A.      Miss Potts?  I remember definitely seeing

20 her two times; she was sitting at the desk and

21 then she came to the kitchen.  Two.

22 Q.      Two times.  Okay.  Did you ever speak to

23 Maryanne Booth about Mr. Kamara?

24 A.      Personally, face-to-face?

131

1 Q.      Yes.

2 A.      No.

3 Q.      How about on the phone?

4 A.      No.

5 Q.      Was there any other communication you had

6 with Miss Booth about Mr. Kamara?

7 A.      Debra Potts would say Maryanne Booth

8 wants you to write up.

9          MR. NEEDLEMAN:  Can I take two

10 seconds?

11          MR. GONZALES:  Yes.

12          (Pause)

13 BY MR. GONZALES:

14 Q.      Seeney-5, which is the February 4, 2006

15 letter, at the top it says I am writing this

16 letter as requested by Debra Potts.  Did Miss

17 Potts request you to prepare this report?

18 A.      Yes, she did; that might have been when

19 she was in the kitchen, I guess.

20 Q.      And was there any discussion with her

21 about the fact that there would be some follow up

22 about your complaints regarding Mr. Kamara?

23 A.      Follow-ups?  No.

24 Q.      Okay.  Now you resigned from Elwyn on

132

1 February 22nd, 2006, correct?

2 A.      Yes.

3          (At this time, a document was

4          marked for identification as Exhibit No.

5          Seeney-6.)

6 BY MR. GONZALES:

7 Q.      Did you prepare this letter?

8 A.      Yes, I did.

9 Q.      Is that your signature?

10 A.      Yes, that's my signature.

11 Q.      Did you mail this or did you hand deliver

12 it?

13 A.      February 22nd, let me see.  Four o'clock

14 a.m. he told me to leave.

15 Q.      Who did?

16 A.      Luseni Kamara.

17 Q.      Okay.

18 A.      Because I didn't follow his direction.

19 Q.      The incident with the refrigerator?

20 A.      Yes.

21 Q.      So you left at 4:00 a.m.?

22 A.      I left at 4:00 a.m. and after security

23 told me to leave.  I am thinking about the

24 termination letter that Maryanne Booth had given

133

1 me four months earlier.

2 Q.      What termination letter was that?

3 A.      The one you just handed me.

4          MR. NEEDLEMAN:  Seeney-1.

5          THE WITNESS:  This one here,

6          (indicating.)

7 BY MR. GONZALES:

8 Q.      Where does it say that you were

9 terminated?

10 A.      "Should a situation arise in the future,

11 warranting additional disciplinary action, we

12 will proceed to the next progressive step, up to

13 and including termination..."

14 Q.      Where does it say that they are going to

15 terminate you?

16 A.      There is the word termination.

17 Q.      Did you see the words before that, "up to

18 and including termination"?

19 A.      Well, I had an incident in October, it

20 was an incident in October.

21 Q.      That's this incident that you just read

22 about, the incident with Bruce.

23 A.      Yes, that one.  So then in February 22nd

24 he says I am not following directions and I had

34 (Pages 130 to 133)

134

1 to go back, he wanted me to take the glass out of
2 the refrigerator so, you know, it says
3 termination.
4 Q.      No, it doesn't say termination; it says
5 you can be disciplined up to and including
6 termination.
7 A.      Including termination.
8 Q.      So this is what you were relying upon to
9 believe that you would be terminated?
10 A.      I didn't have the paper on me at the
11 time; I don't carry it around with me but it is
12 at home.
13 Q.      My question isn't where the paper was, my
14 question is, is this the paper you were relying
15 upon for the belief that you would be terminated
16 if you received any more discipline at Elwyn?
17 A.      It is Booth's words; she should not have
18 written it that way.
19          MR. NEEDLEMAN:  Please answer
20     Mr. Gonzales' question.
21 BY MR. GONZALES:
22 Q.      Is this the document that you relied upon
23 for the belief that you would be terminated if
24 you received any more discipline at Elwyn?

135

1 A.      Yes.
2 Q.      Okay.  And, therefore, when you believed
3 that you would be disciplined for failing to
4 follow a directive from Mr. Kamara in February of
5 2006, you decided to resign instead of receiving
6 that next level of discipline, is that correct?
7 A.      Well, since I am a woman who has been
8 practically escorted off grounds three times, I
9 wasn't looking for any rewards when she got into
10 Maryanne Booth's -- back to Maryanne Booth that I
11 wasn't following his directions.
12 Q.      Can you read my question back?
13          (At this time, the court
14     reporter read back from the record as was
15     requested.)
16 Q.      Can you answer that question for me,
17 please?
18 A.      Yes.
19 Q.      And your answer is yes?
20 A.      Yes.
21 Q.      Okay.  You said you were escorted off
22 campus three times when were you --
23 A.      Two, and told to me once.
24 Q.      And you were told to leave after the

136

1 October 2005 incident with Bruce, correct?
2 A.      Well, I was sent home by security guards,
3 yes.
4 Q.      Security guards came on October --
5 A.      Wait a minute, wait a minute.  You know
6 --
7 Q.      Slow it down.  What's your recollection?
8 A.      When you have all this abuse, you can't
9 remember what order it comes in.  So wait a
10 minute, February?
11 Q.      No, October.  Were you escorted by
12 security or were you directed to leave and then
13 you just left?
14 A.      Directed to leave.
15 Q.      So no security in October, correct?
16 A.      No security in October.
17 Q.      You weren't escorted off in October of
18 2005, correct?
19 A.      No, just told to go home.
20 Q.      When was the first time that you were
21 escorted off campus by security?
22 A.      That was in 1999.
23 Q.      Okay.  And what was that over?
24 A.      Paperwork.

137

1 Q.      What paperwork?
2 A.      Elwyn said I wasn't doing my paperwork.
3 Q.      So you were escorted off by security?
4 A.      Yes.
5 Q.      And then you worked another seven, six,
6 six years after that, right?
7 A.      Yes.
8 Q.      So the second time that you were escorted
9 by security was the incident in February of 2006,
10 correct, where you didn't clean --
11 A.      My last day there, yes.
12 Q.      Now, the letter, the resignation letter
13 which we have marked as Seeney-6, how did you
14 deliver that to Elwyn?
15 A.      By hand.
16 Q.      To whom?
17 A.      Pete Vitarelli.
18 Q.      When?
19 A.      I hope my sister put a date on this;
20 February 22nd.
21 Q.      What time?
22 A.      That was nine o'clock in the morning.  I
23 tried to get there as soon as I knew he would be
24 in his office.

35 (Pages 134 to 137)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

138

1 Q.    And did you meet with him in his office?
2 A.    I was in his -- I believe it was his
3 office, yes.
4 Q.    And did you say anything to him?
5 A.    I came in and said I am resigning.
6 Q.    And what did he say?
7 A.    And I gave him this. (Indicating.)
8 Q.    And what did he say?
9 A.    Nothing out of the ordinary; I mean it
10 was so basic I can't even remember.
11 Q.    Didn't he ask you if you wanted to work
12 in a different part of Elwyn away from Mr.
13 Kamara?
14 A.    Absolutely not. No, he did not. He did
15 not bring up Luseni Kamara.
16 Q.    It's your testimony that he did not offer
17 to have you work somewhere else within Elwyn
18 because they didn't want you to leave?
19 A.    No.
20 Q.    They didn't want to lose you?
21 A.    No.
22 Q.    So he didn't say anything like that to
23 you?
24 A.    No, please. No. Absolutely not, no.

139

1 Never. Never. My mother and father is watching.
2 No. Is that what he told you? No.
3          MR. NEEDLEMAN: You answered his
4      question.
5          THE WITNESS: You know I am
6      just --
7          MR. NEEDLEMAN: Sheila, you
8      haven't been asked a question. Mr.
9      Gonzales asked you a question, you
10      answered it, wait for the next question.
11          THE WITNESS: Okay.
12 BY MR. GONZALES:
13 Q.    Had you ever met with Mr. Vitarelli
14 before then?
15 A.    I have given Pete one or two of these
16 reports; he will own up to one report. I believe
17 I gave him two.
18 Q.    That wasn't my question. Did you ever
19 meet with Mr. Vitarelli before?
20 A.    Along the lines somewhere maybe in '99 I
21 had went and said to Pete I want to leave Cottage
22 1, yeah.
23 Q.    Other than that one meeting with him in
24 1999, had you ever met with him between '99 and

140

1 February of 2006?
2 A.    For some reason I told him I wanted to
3 leave that building.
4 Q.    Listen to my question. Had you met with
5 Mr. Vitarelli at any time between that meeting in
6 1999 and February of 2006?
7 A.    No. When I would go to his office the
8 door would be shut.
9 Q.    You answered my question.
10 A.    Okay.
11 Q.    Had you spoken to him between 1999 and
12 2006?
13 A.    No.
14 Q.    Do you have any reason to believe or --
15 A.    Well, '99 -- like I said, in '99 you had
16 to go to the administration building in order to
17 sign for another building.
18 Q.    I understand. I am not concerned with
19 that. I want to know whether you spoke with him
20 or met with him between 1999 and 2006?
21 A.    Concerning what?
22 Q.    Anything.
23 A.    One time.
24 Q.    When was that?

141

1 A.    In '99 was to get a new building.
2 Q.    You told me about that. I am saying
3 between --
4 A.    After that, no.
5 Q.    Okay. Do you have any evidence or reason
6 to believe that Mr. Vitarelli would lie about the
7 meeting that you had with him in February of
8 2006?
9          MR. NEEDLEMAN: I am going to
10      object to the form. You can answer the
11      question.
12          THE WITNESS: Well, what I am
13      hearing since our four years have passed
14      is that human resources should have
15      questioned me about why I was leaving and
16      such.
17 BY MR. GONZALES:
18 Q.    After you --
19 A.    So I am feeling that it was somewhat of a
20 responsibility of his, I don't know.
21 Q.    Any other reason that you can think of
22 that you would say that if it didn't happen?
23 A.    No, I don't know why. Other than Pete
24 has a lot to do, I don't know. It's a big job.

**36  (Pages 138 to 141)**

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

142

1 Q.      Now, you were offered reinstatement at
2 Elwyn when you went to the EEOC in this matter,
3 do you remember that?
4 A.      Yes, I do.
5 Q.      And you rejected that, correct?
6         MR. NEEDLEMAN:  I am going to
7    object to the form.  You can answer the
8    question.
9         THE WITNESS:  I can answer it?
10        MR. NEEDLEMAN:  Yeah.
11        THE WITNESS:  Yes, they did
12   offer me my job back with $3,000.  I
13   think according to OSHA it should have
14   been my full salary, I should have been
15   given two years back pay; that was not
16   offered.
17 BY MR. GONZALES:
18 Q.      So for that reason you did not want to be
19 reinstated to Elwyn?
20 A.      No, that and I was fearful a fourth
21 escort off grounds.
22 Q.      And you were advised at that meeting that
23 Mr. Kamara had been terminated, correct?
24 A.      Through the wind.

143

1 Q.      Well, you were also notified at that
2 meeting, weren't you?
3 A.      I think I asked.
4 Q.      After you left but before you filed any
5 claims with the EEOC or the Human Relations
6 Commission, did you file any other grievances or
7 complaints with the union about Mr. Kamara?
8 A.      No, other than the four complaints -- oh,
9 Anita Sammons, Debra Potts and Cheryl Reaves --
10 oh, I called administration building.  When I
11 went to the administration building I got on
12 their phone and I put a complaint into
13 administration to --
14 Q.      When?
15 A.      -- Sandra Kanease. (ph)
16 Q.      Who?
17 A.      Dr. Sandra --
18 Q.      Oh, okay.  Doctor Cornelius.  When did
19 you do that?
20 A.      Same day as the suspension letter.
21 Q.      October of 2005?
22 A.      Yes.
23 Q.      Okay.  How about after your resignation
24 but before you filed your claim with the Human

144

1 Relations Commission at the EEOC, did you file
2 any grievances or complaints with Elwyn or the
3 union during that time period about Mr. Karmara's
4 behavior?
5 A.      After I had resigned?
6 Q.      Yes.
7 A.      No.
8 Q.      Other than these four written complaints
9 that you submitted to Elwyn, are there any other
10 written complaints that you prepared about Mr.
11 Kamara that you submitted either to the union or
12 to Elwyn?
13 A.      Not that I remember, no.
14 Q.      Okay.  Have you treated with any medical
15 provider for any emotional or psychiatric damages
16 that you claim you have sustained because of Mr.
17 Kamara's behavior or your employment at Elwyn in
18 general?
19 A.      No.
20 Q.      Did you ever apply for a position at any
21 other employer other than the two employers you
22 mentioned when I first started questioning you
23 this morning?
24 A.      No.

145

1 Q.      When you worked in Cottage 1 were you
2 ever provided with chore lists, a list of chores
3 that you were supposed to do?
4 A.      Yes.
5 Q.      Did those chore lists change at all with
6 when Mr. Kamara became the supervisor?
7 A.      Yeah, he added more on to the list.
8 Q.      Okay.
9 A.      He had us doing housekeeping duty.
10 Q.      What did you think about that?  What did
11 you feel about that?
12 A.      Well, you have housekeepers who are in
13 there getting paid weekly; with all the work that
14 I had to do, why do I need to do housekeeping.
15 Q.      And those housekeeping chores were for
16 all of the employees in Cottage 1, correct?  In
17 other words, you didn't get the Sheila Seeney
18 chore list and everyone else got a different
19 chore list?
20 A.      Well, there was only two of us, Karen
21 Wynn and me, on third shift.
22 Q.      And she got the same chore list as you
23 did, correct?
24 A.      Yes.

37 (Pages 142 to 145)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

SHEILA SEENEY

146

1 Q.     Did you ever talk to Peter Vitarelli
2 before your resignation, like a couple days
3 before about Mr. Kamara and the way he was
4 treating you?
5 A.     What set the whole thing off was the
6 refrigerator and my not following his direction;
7 everything was okay up to that time four o'clock
8 that night. No, I had never talked to Pete
9 before then or anybody before then. I am not
10 lying.
11          MR. GONZALES: That's all the
12      questions I have. Thank you.
13          THE WITNESS: Okay. Thank you.
14          MR. NEEDLEMAN: I have one
15      question.
16 BY MR. NEEDLEMAN:
17 Q.     Miss Seeney, good afternoon. I wanted to
18 clear up something I think was a little bit
19 unclear during a certain amount of questioning in
20 your testimony earlier with Mr. Gonzales.
21          You had given testimony about a fact
22 finding hearing or a fact finding meeting that
23 would take place at Elwyn; do you recall that
24 testimony?

147

1 A.     I'm sorry, can you say this again,
2 please? You are talking about fact finding?
3 Q.     Yeah. After you made some complaints
4 about Mr. Kamara and Mr. Gonzales asked you if
5 you were aware of any investigations performed,
6 you had mentioned, I think, that you did not
7 participate in a fact finding hearing?
8 A.     No, they never included me, if there was.
9 Q.     What I'm trying to find out is -- so you
10 recall that testimony, correct, you recall that
11 discussion?
12 A.     Yeah, I remember talking.
13 Q.     Perfect. What I am trying to find out
14 is, were you saying then that the normal
15 procedure at Elwyn when a complaint is made is
16 that there is this kind of hearing?
17 A.     Yes.
18 Q.     And that you didn't get one?
19 A.     I didn't get one.
20 Q.     Okay. Can you think offhand of somebody
21 else who got one, somebody else who participated
22 in one after making a complaint, maybe somebody
23 you heard about, somebody told you?
24 A.     Well, you will hear about first and

148

1 second shift, you know, different shifts and
2 different buildings having to go to fact finding.
3 Q.     Can you give us anything more specific
4 than that?
5 A.     Lots of times, like he said, it would be
6 concerning the client. As far as staff members,
7 I am not aware of how that worked but I do
8 remember there was, concerning clients, client
9 abuse or something such as that, but I was
10 thinking, you know, it would even work in my
11 category.
12 Q.     Okay.
13 A.     No one ever called me. Maryanne Booth
14 never called me.
15 Q.     Okay.
16 A.     Other than to give me that letter.
17 Q.     Were the fact findings at Elwyn for staff
18 complaints or for complaints regarding clients or
19 were they both?
20 A.     Incidents concerning clients and staff
21 they would have a fact finder.
22 Q.     How about incidents between staff?
23 A.     I would think so, the parties would get
24 together.

149

1 Q.     Are you aware of any?
2 A.     Now you want me to name names?
3 Q.     No, I don't want you to name names. I
4 want you to tell me whether you are aware.
5 A.     I am aware of fact finding.
6 Q.     As relates to staff-staff disputes?
7 A.     Yes. I am quite sure Pete Vitarelli
8 knows about that.
9 Q.     I just want to know what you know.
10 A.     There was a fact finder, yes.
11 Q.     For staff-staff disputes?
12 A.     That I am questioning now. I don't know.
13 Q.     Okay. You are not sure?
14 A.     No, but I knew there was a fact finders.
15 Q.     That's fine. That's all I am trying to
16 find out.
17 A.     You probably could find out. I didn't
18 pay that much attention.
19 Q.     Okay.
20          MR. NEEDLEMAN: I don't have any
21      further questions. We are done. Thank
22      you.
23          (Witness excused.)
24      (Deposition concluded at 12:59 p.m.)

38 (Pages 146 to 149)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

SHEILA SEENEY

150

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

152

```
1        Exhibit Seeney-1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

151

```
1        C E R T I F I C A T I O N
2
3
4        I, VITA M. MULHOLLAND, a
5   Certified Court Reporter and Notary Public, do
6   hereby certify that the foregoing is a true and
7   accurate transcript of the stenographic notes
8   taken by me in the aforementioned matter.
9
10
11           - - -
12
13
14
15
16
17
18
19
20
21   _____
            VITA M. MULHOLLAND, CCR
22
23
24
```

153

```
1        Exhibit Seeney-2
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**39  (Pages 150 to 153)**

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES